## VITERBO *v.* FRIEDLANDER.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF LOUISIANA.

Submitted March 7, 1886. — Decided March 21, 1887.

The Civil Code of Louisiana, following the civil law of Rome, Spain, and France, and differing from the common law, regards a lease for years as a mere transfer of the thing leased; and holds the landlord bound, without any express covenant, to keep it in repair and otherwise fit for the use for which it is leased, even when the want of repair or the unfitness is caused by an inevitable accident; and if he does not do so, authorizes the tenant to have the lease annulled or the rent abated.

In construing those articles of the Civil Code of Louisiana, which were originally enacted both in French and in English, the French text may be taken into consideration for the purpose of clearing up obscurities or ambiguities in the English text.

The breaking of a crevasse in the levees by the waters of the Mississippi River is a fortuitous or unforeseen event, within the meaning of the Civil Code of Louisiana; and if in consequence thereof a sugar plantation, leased for five years, with the buildings, mules and implements necessary for the cultivation of sugar cane, and with the growing crop of cane (which the lessee agrees to cut and plant as seed cane, and, by way of reimbursing the lessor for, to leave a certain amount of growing cane on the plantation at the end of the lease), is overflowed for three months, all the cane destroyed, the canals and ditches necessary for drainage filled up, the bridges swept away, and a deposit from three to six inches deep left over the whole ground, making it necessary, in order to cultivate it as a sugar plantation the following year, to spend large sums of money to dig out canals and ditches, repair bridges, and buy seed cane, the plantation is partially destroyed, or ceases to be fit for the use for which it was leased, within the meaning of articles 2697 (2667) and 2699 (2669) of that code, and the lessee is entitled to have the lease annulled; notwithstanding the provision of article 2743 (2714) that the tenant of a predial estate cannot claim an abatement of rent for a destruction of a whole or part of his crop by inevitable accidents, unless they are of such a nature that they could not have been foreseen by either party when the lease was made.

THIS was a petition, filed October 2, 1884, by a citizen of France against a citizen of Louisiana, to annul a lease of a sugar plantation from the defendant to the petitioner for five years; and alleging that by an extraordinary rise of the Mississippi River, which could not have been foreseen, and without any fault of the lessee, a crevasse was made in the levees of a neighboring plantation, the leased plantation overflowed, all the cane destroyed, and the plantation rendered wholly unfit for the purpose for which it had been leased; and that the petitioner requested the defendant, as soon as the water from the crevasse should have withdrawn, to put back the plantation in the same condition as when leased, and to replace the plant cane and stubble, and the defendant refused to do so. By direction of the Circuit Court, the case was transferred to the chancery side, and the petitioner filed a bill in equity, containing similar allegations, and praying for like relief.

The lease in question was dated October 27, 1883, and was

of " a sugar plantation, situated in the parish of St. Charles in this state, known as Friedlander's plantation," and "all the buildings, outhouses, fences, sugar-houses, and other appurtenances thereof," (particularly described,) from September 27, 1883, to December 15, 1888, at an annual rent of $5000, which the lessee agreed to pay; and contained the following provisions:

" And the said lessor further declared that he does hereby give unto said lessee all of the growing cane crop of 1883 now standing in the field, which the said lessee expressly binds himself to plant as seed cane on said plantation. And to reimburse said lessor for said cane crop, said lessee binds himself to leave on said plantation for the sole use and benefit of said lessor, at the termination of this lease, December 15, 1888, eighty-five acres of full-standed seed cane (such as is usually called first year's stubble) which has been thoroughly cultivated, cut at the proper time for saving seed, and carefully windrowed, especially for seed; and in addition thereto, said lessee shall also leave on said plantation for said lessor not less than two hundred acres of stubble from what is called plant cane, which shall be properly protected in the ground."

" And said lessee binds himself to deliver said plantation at the expiration of this lease, with the ditches in a good draining condition, sufficiently so for the proper cultivation of as much land as may have been under cultivation by said lessee during his fourth year's occupancy of said plantation; and the foregoing clause means that said lessee shall not neglect nor allow the filling up of said ditches during the last year of this lease any more than ditches usually fill up in one year on a well managed sugar plantation in good cultivation."

" And the said lessor further declared that he leaves with said lessee, to be used in the culture of sugar cane on said plantation, thirty-four mules," valued at $3700, and implements of husbandry and sugar culture, (particularly enumerated,) valued at $500; all of which the lessee agrees to return in kind or value at the expiration of the lease.

The answer admitted the execution of the lease; and that in March, 1884, when the waters of the Mississippi River were

at their usual spring rise or flood, the levees along its banks near the leased property gave way, and inundated the country to some extent; and the demand and refusal to restore the plantation to its original condition and to replace the cane; but denied the other allegations of the bill.

After the filing of a general replication, the case was referred to a master, who reported the facts as follows:

"The lessee, on entering upon the lease, according to the evidence, found the ditches in a bad condition, and no canal into which to drain the fields, except one on the lower side of the plantation. In order to prepare the ground for cultivation of sugar cane, he decided that a more perfect system of drainage was necessary, and he caused a canal to be dug through the centre of the plantation from the front to the swamp, and enlarged and deepened the ditches, securing thereby a better system of drainage."

"In March, 1884, a crevasse occurred upon what is known as the Davis plantation, the back waters from which crevasse overflowed a large portion of the Friedlander plantation, especially that portion used for cultivation, and it was under water for several months.

"The damage caused by this overflow I find from the evidence to be as follows: The lessee lost, by reason of said overflow, the entire crop of sugar cane of 1884; that is, the 200 acres of stubble cane and the 85 acres of plant cane were destroyed; the ditches were partially, and in some places entirely, filled; the canals, especially the one dug by the lessee, were partially filled, and the bridges generally swept away; the water remained over the land until July, 1884; a deposit was left over the land of from three inches to six inches. To cultivate the land as a sugar plantation the following year (1885), it would require ditches to be redug, the canals to be opened or cleaned out, the bridges replaced, and seed cane to be obtained and planted, all at considerable expense, to put the plantation in the condition it was at date of the crevasse."

"The plaintiff admits the plantation would grow a crop of cane. But it would require a considerable sum of money and labor to put it in good condition for the growing of cane; that

is, it would require seed cane, the canals and ditches to be dug out, and the bridges rebuilt. This work is an incident to the growing of a crop of sugar cane annually. Some years it may require more seed cane, more labor to put the canals and ditches in order, than in others. The land, therefore, has not ceased to be fit for the purposes for which it was leased; on the contrary, some of the witnesses suggest that the deposit has enriched and greatly benefited the land."

The master, after discussing at length the law of the case, concluded and reported that the property leased was not destroyed, and had not ceased to be fit for the purpose for which it was leased; that the loss of the growing crop, the partial filling of the canals and ditches, and the washing away of the bridges, were not caused by an "unforeseen event;" that equity could give no relief to the plaintiff, and that his bill should be dismissed.

Exceptions taken by the plaintiff to the master's report, in regard both to his findings of fact and to his conclusions of law, were overruled by the Circuit Court, and a decree entered for the defendant, dismissing the bill. 24 Fed. Rep. 320.

The plaintiff appealed to this court, and filed the following assignment of errors:

"1st. That when property leased has been rendered unfit for the purpose for which it was leased, by the act of God, the lease is dissolved.

"2d. That the facts show that the plantation leased as a sugar plantation has been destroyed, and the lease is at an end.

"3d. That sugar cane, which is in the form of plant and ratoon or stubbles, is a part and portion of the land, and when destroyed the destruction annuls the lease.

"4th. That the draining ditches and canals, dug by the lessee in fulfilment of his obligation under his lease, become the property of the lessor, and when destroyed by a crevasse it becomes the duty of the lessor to put them back in the condition they were before the crevasse.

"5th. That when a lessor is duly put in default to fulfil a part of his obligations as landlord, and refuses, the lease is dissolved."

*Mr. Charles Louque* and *Mr. Albert Voorhies* for appellant.

*Mr. George H. Braughn* and *Mr. Charles F. Buck* for appellee.

MR. JUSTICE GRAY, after stating the case as above reported, delivered the opinion of the court.

In considering this case, it is important to keep in mind that the view of the common law of England and of most of the United States, as to the nature of a lease for years, is not that which is taken by the civil law of Rome, Spain, and France, upon which the Civil Code of Louisiana is based.

The common law and the civil law concur in holding that in the case of an executed sale a subsequent destruction of the property by any cause is the loss of the buyer. *Res perit domino.* They also concur in holding that performance of an executory obligation to convey a specific thing is excused by the accidental destruction of the thing, without the fault of the obligor, before the conveyance is made. *Taylor* v. *Caldwell,* 3 B. & S. 826; *Wells* v. *Calnan,* 107 Mass. 514; Pothier, Obligations, nos. 657, 668; Contrat de Louage, no. 65; Civil Code of Louisiana, art. 2219 (2216).

But as to the nature and effect of a lease for years, at a certain rent which the lessee agrees to pay, and containing no express covenant on the part of the lessor, the two systems differ materially. The common law regards such a lease as the grant of an estate for years, which the lessee takes a title in, and is bound to pay the stipulated rent for, notwithstanding any injury by flood, fire, or external violence, at least unless the injury is such a destruction of the land as to amount to an eviction; and by that law the lessor is under no implied covenant to repair, or even that the premises shall be fit for the purpose for which they are leased. *Fowler* v. *Bott,* 6 Mass. 63; 3 Kent Com. 465, 466; Broom's Legal Maxims (3d ed.) 213, 214; *Doupe* v. *Genin,* 45 N. Y. 119; *Kingsbury* v. *Westfall,* 61 N. Y. 356; *Naumberg* v. *Young,* 15 Vroom, 331; *Bowe* v. *Hunking,* 135 Mass. 380; *Manchester Warehouse Co.* v. *Carr,* 5 C. P. D. 507.

The civil law, on the other hand, regards a lease for years as a mere transfer of the use and enjoyment of the property; and holds the landlord bound, without any express covenant, to keep it in repair and otherwise fit for use and enjoyment for the purpose for which it is leased, even when the need of repair or the unfitness is caused by an inevitable accident; and if he does not do so, the tenant may have the lease annulled, or the rent abated. Dig. 19, 2, 9, 2; 19, 2, 15, 1, 2; 19, 2, 25, 2; 19, 2, 39; 2 Gomez, Variae Resolutiones, c. 3, §§ 1–3, 18, 19; Gregorio Lopez, in 5 Partidas, tit. 8 ll. 8, 22; Domat, Droit Civil, pt. 1, lib. 1, tit. 4, sect. 1, no. 1; sect. 3, nos. 1, 3, 6; Pothier, Contrat de Louage, nos. 3, 6, 11, 22, 53, 103, 106, 139–155.

It is accordingly laid down in the Pandects, on the authority of Julian, "if any one has let an estate, that, even if anything happens by *vis major*, he must make it good, he must stand by his contract," *si quis fundum locaverit, ut, etiamsi quid vi majore accidisset, hoc ei præstaretur, pacto standum esse;* Dig. 19, 2, 9, 2; and on the authority of Ulpian, that "a lease does not change the ownership," *non solet locatio dominium mutare;* Dig. 19, 2, 39; and that the lessee has a right of action, if he cannot enjoy the thing which he has hired, *si re quam conduxit frui non liceat,* whether because his possession, either of the whole or of part of the field, is not made good, or a house, or stable or sheepfold, is not repaired; and the landlord ought to warrant the tenant, *dominum colono præstare debere,* against every irresistible force, *omnem vim cui resisti non potest,* such as floods, flocks of birds, or any like cause, or invasion of enemies; and if the whole crop should be destroyed by a heavy rainfall, or the olives should be spoiled by blight, or by extraordinary heat of the sun, *solis fervore non assueto,* it would be the loss of the landlord, *damnum domini futurum;* and so if the field falls in by an earthquake, for there must be made good to the tenant a field that he can enjoy, *oportere enim agrum præstari conductori, ut frui possit;* but if any loss arises from defects in the thing itself, *si qua tamen vitia ex ipsa re oriantur,* as if wine turns sour, or standing corn is spoiled by worms or

weeds, or if nothing extraordinary happens, *si vero nihil extra consuetudinem acciderit*, it is the loss of the tenant, *damnum coloni esse.* Dig. 19, 2, 15, 1, 2.

So Domat says: "If the tenant is expelled by the act of the sovereign, by *vis major*, or by some other accident, or if the property is destroyed by an inundation, by an earthquake, or other event, the lessor, who was bound to give the property, cannot demand the rent, and will be bound to restore so much of it as he has received, but without any other damages; for no one ought to answer for accidents." Droit Civil, pt. 1, lib. 1, tit. 4, sect. 3, no. 3.[1]

Pothier brings out the same principles more fully, as applicable to cases resembling the case at bar, saying: "When the thing leased, which the lessor offers to deliver to the lessee, is found not to be entire, the lessor having lost a part of it since the contract, or when it is not in the same condition in which it was at the time of the contract; when what is wanting in the thing, or when the change that has happened in the thing, is such that the lessee would not have been willing to hire this thing, if it had been such as it has since become; in that case, the lessee has the right to refuse to receive the thing, and to demand the annulment of the contract. This takes place, even if it is by a *vis major* occurring since the contract, that the thing is no longer entire, or is destroyed; as, for example, if, since the contract, lightning has burned a considerable part of the house that you have leased to me, and the rest is not sufficient for me to dwell in with my family; or, if a field, that you have leased to me, has been inundated by an overflow of a river, which has left a hurtful deposit that has spoiled the grass; but in this case I can only demand the annulment of the bargain, without being able to claim any damages for its non-execution."[2] Contrat de Louage, no. 74.

---

[1] "3. Si le preneur est expulsé par le fait du prince, par une force majeure, ou par quelque autre cas fortuit, ou si l'héritage périt par un débordement, par un tremblement de terre, ou autre événement, le bailleur, qui était tenu de donner le fonds, ne pourra prétendre le prix du bail, et sera tenu de rendre ce qu'il en avait reçu, mais sans aucun autre dédommagement; car personne ne doit répondre des cas fortuits."

[2] "74. Lorsque la chose louée, que le locateur offre de délivrer au conducteur, ne se trouve pas entière, le locateur en ayant perdu une partie depuis le

Again; after laying down the general principles that " the tenant, lessee or farmer ought to have an abatement of the whole rent, when the lessor has not been able to procure him the enjoyment or the use of the thing leased;" and that " when the tenant has not been absolutely deprived of the enjoyment of the thing, but by an unforeseen accident his enjoyment has suffered a change and a very considerable diminution, he can demand a proportionate diminution in the rent, during the time that his enjoyment has suffered that diminution;" he says that, according to these principles, " when by *vis major* a farmer has been deprived of the power of gathering the fruits of one of the years of his lease; as if an enemy has ravaged all the standing corn on the land leased, or all the fruits yet ungathered have been destroyed by an overflow of a river, or by a swarm of locusts, or by any like accident; in all these cases, the farmer ought to have an abatement of the year's rent;" but that " the accident, which has caused a considerable loss of the fruits, must be an extraordinary accident, and not one of those ordinary and frequent accidents which a farmer ought to expect. For example, the tenant of a vineyard cannot demand an abatement of his rent for the loss caused by frost, blight or hail, unless it was an extraordinary frost or hail storm that caused the total loss of the fruits." [1]

contrat, ou lorsqu'elle ne se trouve pas au même état qu'elle était lors du contrat; quand ce qui manque de la chose, ou quand le changement, qui est arrivé dans la chose, est tel que le conducteur n'eût pas voulu prendre cette chose à loyer, si elle se fût trouvée telle qu'elle est devenue depuis; en ce cas, le conducteur est bien fondé à refuser de recevoir la chose, et à demander la résolution du contrat. Cela a lieu, quand même ce serait par une force majeure survenue depuis le contrat, que la chose ne se trouverait plus entière, ou se trouverait détruite; comme, par exemple, si, depuis le contrat, le feu du ciel avait brûlé une partie considérable de la maison que vous m'aviez louée, et que ce qui en reste ne fût pas suffisant pour m'y loger avec ma famille; ou si une prairie, que vous m'aviez louée, avait été inondée par un débordement de rivière, lequel y a laissé un mauvais limon qui en a gâté l'herbe; mais, dans ce cas, je ne pourrais demander que la résolution du marché, sans pouvoir prétendre aucuns dommages et intérêts pour son inexécution."

[1] "PREMIER PRINCIPE. Le conducteur, locataire ou fermier, doit avoir la remise du loyer pour le tout, lorsque le locateur n'a pu lui procurer la jouissance ou l'usage de la chose louée."

Contrat de Louage, nos. 139–163. See also nos. 309, 477; Introduction aux Coutumes d'Orléans, tit. 19, nos. 17–22.

· The Civil Code of Louisiana affirms the same general princi- ples.   A lease is defined to be a contract by which "one party gives to the other the enjoyment of a thing" at a fixed price. Art. 2669 (2639).   "He who grants a lease is called the *owner* or *lessor*.   He to whom the lease is made is called the *lessee* or *tenant*."   Art. 2677 (2647).   "The lessor is bound, from the very nature of the contract, and without any clause to that effect: 1. To deliver the thing leased to the lessee.   2. To maintain the thing in a condition such as to serve for the use for which it is hired.   3. To cause the lessee to be in peace- able possession of the thing during the continuance of the lease."   Art. 2692 (2662).   "The lessor is bound to deliver the thing in good condition and free from any repairs.   He ought to make, during the continuance of the lease, all the repairs which may accidentally become necessary, except those which the tenant is bound to make, as hereafter directed." Art. 2693 (2663).   "The lessor guarantees the lessee against all the vices and defects of the thing which may prevent its being used," even if unknown to the lessor at the time of mak- ing the lease, or arising since, if they do not arise from the fault of the lessee ; and to indemnify him for any loss result-

─────────────────────────────

"Sixième principe.   Lorsque le conducteur n'a pas été privé absolument de la jouissance de la chose, mais que, par un accident imprévu, sa jouis- sance a souffert une altération et une diminution très considérable, il peut demander une diminution proportionnée dans le loyer, depuis le temps que sa jouissance a souffert cette diminution."

"153. Suivant les principes proposés au paragraphe premier, lorsqu'un fermier a été, par une force majeure, privé de pouvoir recueillir les fruits de quelqu'une des années de son bail; *putà*, si un parti ennemi a fourragé tous les blés encore en herbe de la terre qu'il tient à ferme, ou si tous les fruits, qui étaient encore sur pied, ont péri par une inondation de rivière, par un essaim de sauterelles, ou par quelque accident semblable; en tous ces cas, le fermier doit avoir remise de l'année de ferme."

"163. Il faut que l'accident, qui a causé une perte considérable des fruits, soit un accident extraordinaire, et non pas de ces accidents ordinaires et fréquens auxquels un fermier doit s'attendre.   Par exemple, le fermier d'une vigne ne doit pas demander une remise de sa ferme pour la perte qu'a causée la gelée, la coulure ou la grêle, à moins que ce ne fût une gelée ou une grêle extraordinaire qui eût causé la perte totale des fruits."

ing from them. Art. 2695 (2665). "The lessee is bound: 1. To enjoy the thing leased as a good administrator, according to the use for which it was intended by the lease. 2. To pay the rent at the terms agreed on." Art. 2710 (2680). The repairs which the tenant is bound to make are mere petty repairs inside a house, and repairs of windows, including "replacing window glass, when broken accidentally, but not when broken, either in whole or in their greatest part, by a hail storm or by any other inevitable accident." Art. 2716 (2686). "The expenses of the repairs which unforeseen events or decay may render necessary must be supported by the lessor, though such repairs be of the nature of those which are usually done by the lessee." Art. 2717 (2687). "The lessee is only liable for the injuries and losses sustained through his own fault." Art. 2721 (2691). And the lease "is dissolved by the loss of the thing leased." Art. 2728 (2699).

The above articles of the Codes of 1825 and 1870, with only verbal differences, and in the same order, are all to be found in the Louisiana Code of 1808,[1] and all of them, (except that which designates the parties, and the two last above quoted, which are but repetitions or corollaries of the others,) in the Code Napoleon;[2] and the books, titles and chapters, under which the various matters are arranged in the Code of 1808, correspond for the most part to those of the Code Napoleon of 1807, or Code Civil des Français of 1804, and still more closely to those of the *projet* or commissioners' report of that code, which had been published in 1801. 2 Discussions du Code Civil, 536, note. Chief Justice Martin states that in 1807, when the first Civil Code of Louisiana was reported to the territorial legislature by Moreau Lislet and Brown, no copy of the French Code had as yet reached New Orleans; "and the gentlemen availed themselves of the project of that work, the arrangement of which they adopted, and *mutatis mutandis* literally transcribed a considerable portion of it." 2 Martin's History of Louisiana, 291. The provisions of the laws of Spain, as they formerly existed in Louisiana, upon the

---

[1] Louisiana Code of 1808, lib. 3, tit. 8, arts. 2, 6, 17–19, 26, 30, 31, 35, 40.

[2] Code Napoleon, arts. 1709, 1719–1721, 1728, 1754, 1755.

subject before us, were quite different in their details. Asso and Manuel's Institutes, lib. 2, tit. 14; 1 White's Land Laws, 201–204; 5 Partidas, tit. 8; ll. 1, 4–7, 18–24; Schmidt's Law of Spain and Mexico, 163–170. It is manifest, therefore, that the language of these provisions of the Louisiana Code was taken from the French Code.

The Codes of 1825 and 1870 also contain the following article:

"Art. 2697 (2667). If, during the lease, the thing be totally destroyed by an unforeseen event, or if it be taken for a purpose of public utility, the lease is at an end. If it be only destroyed in part, the lessee may either demand a diminution of the price, or a revocation of the lease. In neither case has he any claim for damages." [1]

This article was in a more condensed form in the Code of 1808, lib. 3, tit. 8, art. 20, namely: "If by any accident, the thing leased should be either totally or partly destroyed, the lessee may, according to the nature of the case, either claim a diminution of the rent or the cancelling of the lease, but he cannot claim to be indemnified." [2]

As it now stands, it has been restored to the very words of the corresponding article 1722 of the Code Napoleon, except in omitting the words "according to circumstances," *suivant les circonstances*, as affecting the claim of the lessee in the case of partial destruction, which were in that article, as well as in the Code of 1808; and in inserting the words "or if it be taken for a purpose of public utility," which were not expressed in the Code Napoleon, but would doubtless be implied, for a taking of property for the public use was always deemed

---

[1] Also in French, in the Code of 1825: "Si, pendant la durée du bail, la chose louée est détruite en totalité par cas fortuit, ou est prise pour un objet d'utilité publique, le bail est résilié de plein droit. Si elle n'est détruite qu'en partie, le preneur a le choix de demander une diminution de prix, ou la résiliation du bail. Dans l'un et l'autre cas, il n'y a lieu à aucun dédommagement."

[2] And in French: "Si, pendant la durée du bail, la chose louée est détruite, en tout ou en partie, par cas fortuit, le preneur peut, suivant les circonstances, demander, ou une diminution du prix, ou la résiliation du bail; mais sans aucun autre dédommagement."

a species of destruction by *vis major.* Pothier, Contrat de Louage, no. 65; 3 Duvergier, Droit Civil, no. 332.

The following article, not to be found in so many words in the Code Napoleon, or in the Louisiana Code of 1808, first appears in the Code of 1825:

"Art. 2699 (2669). If, without any fault of the lessor, the thing cease to be fit for the purpose for which it was leased, or if the use be much impeded, as if a neighbor, by raising his walls, shall intercept the light of a house leased, the lessee may, according to circumstances, obtain the annulment of the lease, but has no claim for indemnity."[1]

But this article, too, only affirms a reasonable, if not necessary, construction of article 2697 (2667); for the lessor being held to warrant that the lessee shall enjoy the property for the use for which it was leased, any cause which makes his enjoyment impossible has the same effect as if it destroyed the property. This is clearly shown by Ulpian and by Pothier, in the various passages above referred to. So Troplong says, that if the *vis major* lets the thing exist in whole and in all its parts, but prevents the lessee from taking or keeping the enjoyment, this case does not come exactly within the letter of article 1722 of the Code Napoleon; but the spirit should give life to the text, *mais l'esprit doit venir vivifier le texte;* and it is certain that this case of *vis major* would give an opening for an annulment of the lease or an abatement of the rent. Troplong, Droit Civil, no. 225. See also 6 Marcadé, 450; *Bowditch* v. *Heation,* 22 La. Ann. 356. From the earliest times, also, the building up by a neighbor so as to darken the lights of a house leased was held to entitle the tenant to relief. Dig. 19, 2, 25, 2; Domat, pt. 1, lib. 1, tit. 4, sect. 3, no. 6; Pothier, Contrat de Louage, no. 325.

Under articles 2697 (2667) and 2699 (2669) of the Louisiana Code, as under article 1722 of the Code Napoleon, it is not, of

---

[1] And in French, in the Code of 1825: "Si la chose cesse, sans le fait du bailleur, d'être propre à l'usage pour lequel elle était louée, ou si l'usage en est devenu très incommode, comme si un voisin, en élevant ses murs, intercepte les jours de la maison louée, le preneur peut, suivant le cas, obtenir la résiliation du bail; mais il ne lui est dû aucune indemnité."

course, every-destruction of part of the thing leased, or injury to its fitness for the use for which it was leased, by an unforeseen event or *cas fortuit*, that entitles the lessee to have the lease annulled; and it is for the court to decide whether the destruction or the injury is grave enough. But if by such an event an important part of the property is destroyed, or the property is made unfit for its destined use, the lessee has the right to elect the annulment of the lease, and is not obliged to be satisfied with an abatement of the rent. Troplong, nos. 202, 213; 30 Dalloz, Louage, nos. 200–202; 6 Marcadé, 448; 25 Laurent, Droit Civil, arts. 402–404.

The learned counsel for the defendant much relied on some dicta of Louisiana judges to the effect that the law of the State does not favor the abrogation of a lease when the loss or inconvenience is not caused by the fault of the lessor. *Dussnau* v. *Generis*, 6 La. Ann. 279; *Denman* v. *Lopez*, 12 La. Ann. 823; *Foucher* v. *Choppin*, 17 La. Ann. 321; *Penn* v. *Kearny*, 21 La. Ann. 21, 23. But such dicta cannot be understood as laying down a general rule, in opposition to the express words of articles 2697 (2667) and 2699 (2669) of the Civil Code. The circumstances of each of the cases in which they were uttered were quite different from those before us; in two of them the injury or inconvenience was comparatively unimportant; and in the other two the tenant had not surrendered the lease, but remained in possession. In a later case than any of these, which was one of partial destruction by fire of a building in a city, the court held that under article 2697 (2667) the lessee, although he might, if he pleased, have the rent abated, had a perfect right to elect to have the whole lease annulled. *Higgins* v. *Wilner*, 26 La. Ann. 544.

All the articles, already cited, except perhaps those regarding tenant's repairs, clearly apply to farms and plantations as well as to houses; for one of the first articles of the Louisiana Code on the subject of leases declares, "The letting out of things is of two kinds, to wit: 1. The letting out houses and movables. 2. The letting out predial or country estates." Art. 2676 (2646); Code of 1808, lib. 3, tit. 8, art. 4. And the corresponding articles in the Code Napoleon, excepting the

introductory definitions, are placed under the heading "Of the rules common to leases of houses and of rural property;" those as to tenant's repairs being placed under the heading "Of the rules peculiar to leases for hire," that is to say, of houses and furniture.

The Louisiana Code of 1808, lib. 3, tit. 8, art. 54, as well as each of the subsequent codes, contains the following article relating to rural or predial estates only:

"Art. 2743 (2714). The tenant of a predial estate cannot claim an abatement of the rent, under the plea that, during the lease, either the whole or a part of his crop has been destroyed by accidents, unless those accidents be of such an extraordinary nature that they could not have been foreseen by either of the parties at the time the contract was made, such as the ravages of war extending over a country then at peace, and where no person entertained any apprehension of being exposed to invasion, or the like.

"But even in these cases, the loss suffered must have been equal to the value of one half of the crop at least, to entitle the tenant to an abatement of the rent.

"The tenant has no right to an abatement, if it is stipulated in the contract that the tenant shall run all the chances of all foreseen and unforeseen accidents." [1]

To this the following article was added in the Code of 1825:

"Art. 2744 (2715). The tenant cannot obtain an abatement, when the loss of the fruit takes place after its separation from the earth, unless the lease give to the proprietor a portion of

---

[1] And in French, in the Codes of 1808 and 1825:

"Le fermier d'un bien rural ou de campagne ne peut obtenir aucune remise sur le prix du bail sous prétexte que, pendant la durée de son bail, la totalité, ou partie de sa récolte, lui aurait été enlevée par des cas fortuits, si ce n'est que ces cas fortuits fussent d'une nature extraordinaire, et dont l'événement n'a pu raisonnablement être prévu, ou supposé par les parties, lors du contrat, tels que les ravages de la guerre au milieu d'un pays qui était en paix, et où l'on devait se croire naturellement à l'abri de toute invasion, et autres cas semblables.

"Encore, pour obtenir cette remise, faut-il que la perte éprouvée soit au moins de la moitié de la récolte, et que le preneur ne soit pas chargé par le bail de tous les cas prévus ou imprévus."

the crop in kind; in which case the proprietor ought to bear his share of the loss, provided the tenant has committed no unreasonable delay in delivering his portion of the crop." [1]

These articles take the place of several articles contained in the Code Napoleon, under the heading " Of the rules peculiar to leases of rural property," of which the following is a translation: [2]

" 1769. If the lease is made for several years, and if, during the continuance of the lease, the whole or at least the half of a crop is destroyed by accidents, the tenant may demand an abatement of the rent, unless he is indemnified by the preceding harvests. If he is not indemnified, the estimate of the abatement can only take place at the end of the lease, at which time an account is taken of all the years of enjoyment; and nevertheless the judge may provisionally relieve the tenant from paying a part of the rent, by reason of the loss suffered.

" 1770. If the lease is only for one year, and the loss is of the whole of the fruits, or at least of the half, the tenant shall

---

[1] And in French: " Le fermier ne peut obtenir de remise, lorsque la perte des fruits arrive après qu'ils sont séparés de la terre, à moins que le bail ne donne au propriétaire une quotité de la récolte en nature; auquel cas le propriétaire doit supporter sa part de la perte, pourvu que le preneur ne fût pas en demeure de lui délivrer sa portion de récolte."

[2] The original text is as follows:

" 1769. Si le bail est fait pour plusieurs années, et que, pendant la durée du bail, la totalité ou la moitié d'une récolte au moins soit enlevée par des cas fortuits, le fermier peut demander une remise du prix de sa location, à moins qu'il ne soit indemnisé par les récoltes précédentes. S'il n'est pas indemnisé, l'estimation de la remise ne peut avoir lieu qu'à la fin du bail, auquel temps il se fait une compensation de toutes les années de jouissance; et cependant le juge peut provisoirement dispenser le preneur de payer une partie du prix, en raison de la perte soufferte.

" 1770. Si le bail n'est que d'une année, et que la perte soit de la totalité des fruits, ou au moins de la moitié, le preneur sera déchargé d'une partie proportionnelle du prix de la location.   Il ne pourra prétendre aucune remise, si la perte est moindre de moitié.

" 1771. Le fermier ne peut obtenir de remise, lorsque la perte des fruits arrive après qu'ils sont séparés de la terre, à moins que le bail ne donne au propriétaire une quotité de la récolte en nature; auquel cas le propriétaire doit supporter sa part de la perte, pourvu que le preneur ne fût pas en demeure de lui délivrer sa portion de récolte.   Le fermier ne peut égale-

be discharged from a proportional part of the rent. He cannot claim any abatement, if the loss is less than half.

"1771. The tenant cannot obtain an abatement, when the loss of the fruits takes place after they are severed from the land, unless the lease gives to the landlord a portion of the crop in kind; in which case the landlord ought to bear his part of the loss, provided the tenant has not been guilty of unreasonable delay in delivering to him his portion of crop. Likewise, the tenant cannot demand an abatement, when the cause of the damage was in existence and known at the time when the lease was made.

"1772. The tenant may be charged with accidents by an express stipulation.

"1773. That stipulation is understood of ordinary accidents only, such as hail, lightning, frost or blight. It is not understood of extraordinary accidents, such as the ravages of war, or an inundation, to which the country is not ordinarily subject, unless the lessee has been charged with all accidents, foreseen or not foreseen."

The last clause of article 2743 (2714) of the Louisiana Code was evidently taken from articles 1772 and 1773 of the Code Napoleon. The rest of the article was apparently derived from the view expressed by Pothier in his Contrat de Louage, no. 163, above quoted, which, as has been pointed out by the commentators on the Code Napoleon, was rejected by the framers of that code. Troplong, no. 710; 4 Duvergier, no. 183; 9 Duranton, 261. And article 2744 (2715) is copied word for word from so much of article 1771 of the Code Napoleon.

The decision of the present case mainly depends upon the true construction of articles 2697 (2667) and 2699 (2669) taken

---

ment demander une remise, lorsque la cause du dommage était existante et connue à l'époque où le bail a été passé.

"1772. Le preneur peut être chargé des cas fortuits par une stipulation expresse.

"1773. Cette stipulation ne s'entend que des cas fortuits ordinaires, tels que grêle, feu du ciel, gelée ou coulure. Elle ne s'entend pas des cas fortuits extraordinaires, tels que les ravages de la guerre, ou une inondation, auxquels le pays n'est pas ordinairement sujet, à moins que le preneur n'ait été chargé de tous les cas fortuits, prévus ou imprévus."

in connection with article 2743 (2714) of the Civil Code of Louisiana. But before proceeding to the particular examination of these articles, some other general considerations should be adverted to.

The ordinary rules of interpretation of statutes are applicable to the Louisiana Code.

The Code itself lays down as rules for "the application and construction of laws," that "where the words of a law are dubious, their meaning may be sought by examining the context, with which the ambiguous words, phrases and sentences may be compared, in order to ascertain their true meaning;" that "laws *in pari materia*, or upon the same subject matter, must be construed with a reference to each other; what is clear in one statute may be called in aid to explain what is doubtful in another;" and that "the most universal and effectual way of discovering the true meaning of a law, when its expressions are dubious, is by considering the reason and spirit of it, or the cause which induced the legislature to enact it." Arts. 16–18 (16–18); Code of 1808, prel. tit. arts. 16–18.

In the same spirit Chief Justice Eustis said: "A statute must be construed with reference to its object, to the legislation and system of which it forms a part, in order to ascertain its true meaning and intent; and if its purpose and well ascertained object are inconsistent with the precise words of a part, the latter must yield to the paramount and controlling influence of the will of the legislature resulting from the whole." *Commercial Bank* v. *Foster*, 5 La. Ann. 516, 517. And in *Childers* v. *Johnson*, 6 La. Ann. 634, 638, the court said: "It is a sound rule of interpretation, in construing an article of the Code with reference to a subject matter, to take into view the general system of legislation upon the subject matter, contained in the same work; and where a provision of the Code is invoked in derogation of the common rule regulating the subject matter, the intention so to derogate should be clear and beyond reasonable doubt. If an interpretation can be given to the particular article, which, without doing violence to its terms, will make it harmonize with the general rules and the other provisions of the Code regulating the subject matter, such interpretation should be adopted."

It is to be remembered that the Louisiana Code, as it was originally enacted in 1808, and as it was again promulgated in 1825, and remained in force until 1870, was in French as well as in English. The Code of 1808, enacted before the admission of the State of Louisiana into the Union, was entitled "A Digest of the Civil Laws now in force in the Territory of Orleans, with alterations and amendments adapted to its present system of government;" and the act of March 31, 1808, c. 29, declaring and proclaiming it to be in force in that territory, was published in both languages, and provided that "if, in any of the dispositions contained in the said digest, there should be found any obscurity or ambiguity, fault or omission, both the English and French texts shall be consulted, and shall mutually serve to the interpretation of [the] one and the other." [1]  2 Martin's Digest, 98, 99.

The Constitution of the State of Louisiana, ever since its admission into the Union, has provided that all laws shall be promulgated in the language in which the Constitution of the United States is written. Constitutions of 1812, art. 6, § 15; 1845, art. 103; 1852, art. 100; 1864, art. 103; 1868, art. 103. The constitutions of 1845 and 1852 also contained provisions, that "the secretary of the senate and clerk of the house of representatives shall be conversant with the French and English languages, and members may address either house in the French or English language;" that "the Constitution and laws of this state shall be promulgated in the English and French languages;" and that any amendment of the Constitution, proposed by the legislature, should be published in French and English before being submitted to the vote of the people. Constitutions of 1845, arts. 104, 132, 140; 1852, arts. 101, 129, 141. These provisions were omitted in the constitutions of 1864 and 1868; and the Code of 1870 was promulgated in English only.

But it is a familiar canon of interpretation, that all former

---

[1] In French: "Si, dans quelqu'une des dispositions contenue dans ledit digeste, il se trouve quelque obscurité ou ambiguité, ou quelque faute ou omission, les deux textes Anglais et Français seront consultés pour s'interpréter mutuellement."

statutes on the same subject, whether repealed or unrepealed, may be considered in construing the provisions that remain in force. *Bank for Savings* v. *Collector*, 3 Wall. 495; *Ex parte Crow Dog*, 109 U. S. 556, 561. The reasons are no less strong for referring to former statutes, embodied in a code of laws, to aid in the interpretation of that code. *Bank of Louisiana* v. *Farrar*, 1 La. Ann. 49, 54; *United States* v. *Bowen*, 100 U. S. 508, 513; *Myer* v. *Car Co.*, 102 U. S. 1, 11; *Northern Pacific Railroad* v. *Herbert*, 116 U. S. 642; *Baldwin* v. *Franks, ante,* 678. And the Supreme Court of Louisiana has always held that in construing those parts of the Code which reënact provisions originally enacted in both languages, both texts may be taken into consideration to aid in ascertaining their meaning as parts of one law; and obscurities or ambiguities in the English text have often been cleared up by referring to the greater precision of the French text; although, if the two texts cannot be reconciled, the English must prevail. *Hudson* v. *Grieve*, 1 Martin, 143; *State* v. *Dupuy*, 2 Martin, 177; *Breedlove* v. *Turner*, 9 Martin, 353; *Chretien* v. *Theard*, 2 Martin (N. S.) 582; *Borel* v. *Borel*, 3 Louisiana, 30; *Durnford* v. *Clark's Estate*, 3 Louisiana, 199, 202; *State* v. *Moore*, 8 Rob. La. 518; *State* v. *Mix*, 8 Rob. La. 549; *State* v. *Ellis*, 12 La. Ann. 390; *State* v. *Judge of Eighth District Court*, 22 La. Ann. 581; *Lafourche* v. *Terrebonne*, 34 La. Ann. 1230, 1233.

This accords with the judgment of this court in a case arising under the treaty of 1819, by which Spain ceded Florida to the United States, which was drawn up in Spanish as well as in English; the English part declaring that grants of lands previously made by the king of Spain " shall be ratified and confirmed to the persons in possession;" and the corresponding clause of the Spanish part declaring that such grants " shall remain ratified and confirmed" to the persons in possession. 8 Stat. 258, 259. Chief Justice Marshall said: " The treaty was drawn up in the Spanish as well as in the English language. Both are originals, and were unquestionably intended by the parties to be identical." " If the English and the Spanish parts can, without violence, be made to agree, that construction which establishes this conformity ought to prevail,

If, as we think must be admitted, the security of private property was intended by the parties; if this security would have been complete without the article, the United States could have no motive for insisting on the interposition of the government in order to give validity to the titles which, according to the usages of the civilized world, were already valid. No violence is done to the language of the treaty by a construction which conforms the English and Spanish to each other. Although the words 'shall be ratified and confirmed' are properly the words of contract, stipulating for some future legislative act; they are not necessarily so. They may import that they 'shall be ratified and confirmed' by the force of the instrument itself. When we observe that in the counterpart of the same treaty, executed at the same time by the same parties, they are used in this sense, we think the construction proper, if not unavoidable." *United States* v. *Percheman*, 7 Pet. 51, 88, 89.

Upon a comparison of the English text with the French of so much of the Louisiana Code as bears upon this case, the greater uniformity and precision of the French text, and its striking resemblance to the Code Napoleon, make it quite clear that the French is the original and the English the translation. Moreover, in the concluding article 3556 (3522) of verbal definitions, the French words in the Code of 1825 are arranged alphabetically, with the English equivalent opposite each one, regardless of its own alphabetical order. In the French column, " *Cas fortuits* " are defined as " *Événemens occasionés par une force à laquelle on ne peut pas résister*," or events caused by a force that one cannot resist; opposite to which in the English column is, " Fortuitous event is that which happens by a cause which we cannot resist." But on turning back to the other articles, we find the French " *cas fortuit* " rendered in English in various ways; as "unforeseen event," [1] as " unforeseen accident," [2] as "fortuitous event," [3] as "fortuitous accident," [4] as " accident," [5] and as " chance." [6] In one place, " *cas fortuit ou force majeure* " is rendered "fortuitous event or

---

[1] Art. (2667).
[2] Art. (2756).
[3] Arts. (2290) (2445) (2511).
[4] Art. (2216).
[5] Arts. (2714) (563).
[6] Arts. (571) (2870) (2871) (2872).

irresistible force,"[1] and in another, "accidental and uncontroll-able events;"[2] thus treating the two alternative expressions as synonymous. In the concluding article, also, "*Force*" is defined, both in French and in English, as "the effect of a power which cannot be resisted;" and "*Force majeure*," *vis major*, as "*un fait, un accident que la prudence humaine ne peut ni prévoir ni empêcher*," or a fact or accident which human prudence can neither foresee nor prevent — with a correspond-ing definition of the English equivalent, "Superior force." "*Force majeure*" is also rendered in different places "unfore-seen events,"[3] "overpowering force,"[4] and "force,"[5] only; "*événement de force majeure*" as "accident;"[6] and "*accidens de force majeure*" as "inevitable accident."[7] It cannot be doubted, therefore, that the words "unforeseen event" and "accident," as used in the articles now under consideration, have the meaning of "fortuitous event" or "irresistible force."

The Louisiana Code, following the French law and the Code Napoleon, recognizes two kinds or degrees of what, under vari-ous but equivalent names, has been called *vis major, cas fortuit*, irresistible force, inevitable accident, or unforeseen event; the one, ordinary, which might have been foreseen by any man of common prudence as not unlikely to happen at some time; the other, extraordinary, which could not have been foreseen, or expected to occur at any time. The distinction is clearly stated by Domat, and more fully brought out by the commen-tators on the Code Napoleon; and, as those commentators have clearly shown, the words "*prévus ou imprévus*," as used in speaking of express stipulations by the tenant, literally, "foreseen or unforeseen," respectively mean in this connection those which could have been foreseen as likely to happen, and those which could not have been so foreseen. Domat, pt. 1, lib. 1, tit. 4, sect. 4, no. 6; Troplong, nos. 204, 211, 756; 4 Duvergier, no. 182; 6 Marcadé, 508. The concurrent opinions of the French jurists upon the meaning of the French Code are of the greatest weight in the interpretation of similar pro-

---

[1] Art. (1927).   [3] Art. (2687).   [5] Art. (2917).   [7] Art. (2686).
[2] Art. (2725).   [4] Art. (2910).   [6] Art. (783).

visions in the Code of Louisiana. *Johnson* v. *Bloodworth*, 12 La. Ann. 699, 701.

The general purpose and the common rule of the civil law, as expressed in the Code of Louisiana, are that the lessor shall secure to the lessee the possession, use and enjoyment of the thing leased, against everything but the fault of the latter; and that any loss of the thing, or deprivation of its use or enjoyment, by accidents or fortuitous events, shall be borne by the lessor and not by the lessee. This appears from the general provisions in the articles above quoted, by which the lessor is bound, from the very nature of the contract of lease, and without any clause to that effect, not only to deliver the thing leased to the lessee, but also to maintain it in such a condition as to serve the purpose for which it is leased, to cause the lessee to be in peaceable possession of the thing during the continuance of the lease, to make, during its continuance, all repairs, except some petty internal ones, and to make even those when rendered necessary by unforeseen events; as well as by articles 2697 (2667) and 2699 (2669), which apply both to country estates and to town houses, and entitle the lessee, whenever by a fortuitous event, and without his fault, the thing is either destroyed, or ceases to be fit for the purpose for which it has been leased, or its use is much impeded, to demand the annulment of the lease, and if it is only destroyed in part, to demand either a revocation of the lease or a diminution of the rent.

Article 2743 (2714) is in derogation of this general purpose and common rule, and is therefore to be strictly construed.

A comparison of the language of articles 2697 (2667) and 2699 (2669) with that of article 2743 (2714) discloses substantial differences between the former and the latter, in the cause of injury, in the thing injured, and in the form of relief, of which they speak. It will be convenient to consider these three points of difference in the inverse order.

First. As to the form of relief: Articles 2697 (2667) and 2699 (2669) deal wholly with the ending, revocation or annulment of the lease, except that in the case of a partial destruction of the thing leased the alternative of a diminution of rent

is permitted. But article 2743 (2714) relates to the abatement of rent only, and does not affect the right of the lessee to have the lease annulled.

The case of a tenant demanding an abatement of rent, while retaining his lease, and thereby reserving the opportunity of reaping profits during the rest of the term, stands on quite different ground from the case of a tenant seeking to annul the lease, and thus to give up all prospective benefits at the same time that he is relieved from all burdens.

Second. The injuries spoken of in articles 2697 (2667) and 2699 (2669) are the total or partial destruction of the thing leased, or its ceasing to be fit for the purpose for which it was leased. But article 2743 (2714) is limited to a destruction of the crop only.

There is no doubt that by the civil law, as by the common law, crops, so long as they are standing and ungathered, are part of the land to which they are attached. Louisiana Code, art. 465 (456); Code of 1808, lib. 2, tit. 1, art. 17; Code Napoleon, art. 520; Pothier, de la Communauté, no. 45. In strictness of principle, the title of the standing crops, as of the land on which they stand, would be in the landlord, and a destruction of the crops might have been considered as a partial destruction of the land itself, within article 2697 (2667) of the Louisiana Code, and article 1722 of the Code Napoleon, if no special provision as to the crops had been added; and such was the opinion of Troplong. Troplong, nos. 695–697. On the other hand, it might be considered that as the lessor only warranted to the tenant the enjoyment of the thing leased, that is to say, the possibility of enjoying it, and did not warrant to him the fruits of the enjoyment, a destruction of the crops only, not injuring the capacity of the land to produce other crops, ought not to considered as a destruction or injury of the thing leased. 25 Laurent, no. 455. The framers of either code have solved the difficulty by making special provisions with relation to the loss of a crop by fortuitous events, without otherwise modifying the previous articles which establish the rules applicable to a destruction, by such events, of the property itself, or of its capacity for the use for which it

was leased. One of the principal commentators on the Code Napoleon, after stating the well established construction, above mentioned, that a general stipulation by the tenant against accidents is to be understood of ordinary, and not of extraordinary accidents, says that for the same reason if the tenant assumes the risk, either of ordinary accidents, or of all accidents whatsoever even if extraordinary, he must be understood (unless a different intention is clearly manifested) to stipulate against accidents causing a loss of the crops only, and not against those which deprive him of the use and enjoyment of the property itself. 6 Marcadé, 508.

Third. The contingencies guarded against in articles 2697 (2667) and 2699 (2669) include any unforeseen event, (meaning thereby, as we have seen, any fortuitous event or irresistible force,) whether ordinary or extraordinary, one that might have been foreseen, as well as one that could not have been foreseen. But in article 2743 (2714) the only accidents relieved against are those "of such an extraordinary nature that they could not have been foreseen by either of the parties at the time the contract was made."

Under this article, the Supreme Court of Louisiana in 1861 refused to allow to the tenant of a predial estate an abatement of the stipulated rent, on account of the destruction of his crop by an overflow of the Mississippi River, and gave the following reasons for the decision: "The overflow of the Mississippi River is of such frequent occurrence, that it cannot be regarded as belonging to that class of extraordinary and unforeseen accidents which entitle the tenant of a predial estate to an abatement of rent. Indeed, the overflows of this river are so frequent, that a system of levees has been constructed under the authority of the State, for the purpose of preventing, we may say, the annual inundation of its banks; and so frequently have the waters of this river made breaches in the levees, that even a crevasse itself cannot be considered as an extraordinary accident in the sense of article 2714 of the code, and as such entitle the tenant of a predial estate to a reduction of the stipulated rent, although such crevasse should be the means of overflowing the land leased by the tenant, and thereby de-

stroying a part or the whole of his crop. The periodical overflow of the waters of a river is not an extraordinary accident; and if a party seeks to give to an inundation that character, he must show that it was unusual, unforeseen, and one to which the country was not ordinarily subjected. See Troplong, du Louage, nos. 207, 211. The frequency of overflows and crevasses on the Mississippi River is not disputed in this case, but is, on the other hand, sufficiently established by the evidence." *Vinson* v. *Graves*, 16 La. Ann. 162. That decision has since been followed, without further discussion. *Masson* v. *Murray*, 21 La. Ann. 535; *Jackson* v. *Michie*, 33 La. Ann. 723.

But the utmost extent of those decisions is, that neither an overflow of the Mississippi River, nor even a crevasse, is an "extraordinary and unforeseen accident," for a destruction of a crop caused by which the tenant can have an abatement of rent under article 2743 (2714). That the court did not intend to imply, that such an overflow or crevasse was not an unforeseen accident at all, clearly appears by the carefully guarded language of the opinion in *Vinson* v. *Graves*, as well as by the reference in that opinion to the passages of Troplong in which the violence of a river leaving its bed is classed, with earthquakes and extraordinary snows or rains, as a *cas fortuit*, and is distinguished from the usual rains and snows, and risings of rivers, which necessarily occur in the order of the seasons, and the view of earlier jurists is approved, which divides accidents into accustomed and unaccustomed, ordinary and extraordinary. Troplong, nos. 206, 207, 211. The civilians generally class an inundation under *vis major* or *cas fortuit*. Ulpian and Domat, *ubi supra;* 5 Partidas, tit. 8, l. 22; 4 Duvergier, no. 183; 9 Duranton, 261. And Pothier, in a passage already quoted, states the case of the overflow of a field by a river, leaving a deposit that spoils the grass, as one of those in which the tenant is entitled to have the lease annulled. Contrat de Louage, no. 74.

The annual rise and overflow of a river may doubtless in some countries and places be considered as one of the things that necessarily occur in the order of the seasons. But the

bursting of a river through its natural banks or through artificial dikes must generally be regarded as an accident or *cas fortuit*, ordinary or extraordinary, according to the frequency or infrequency with which it takes place in the tract of country in question. In France, " an inundation, to which the country is not ordinarily subject," is expressly ranged, in article 1773 of the Code Napoleon, before quoted, with the ravages of war, under extraordinary accidents, *cas fortuits extraordinaires.* In Louisiana, the breaking of the Mississippi through the levees occurs so often that it is held not to be an extraordinary accident; but that does not take it out of the general class of accidents or unforeseen events, *cas fortuits.*

The breaking of a crevasse in the Louisiana levees by the waters of the Mississippi River, causing a plantation to be overflowed, must therefore be considered as a *cas fortuit*, a fortuitous or unforeseen event, within the meaning and scope of articles 2697 (2667) and 2699 (2669), entitling the lessee, if thereby the plantation is wholly or partly destroyed, or is rendered unfit for the purpose for which it was leased, to have the lease annulled; although it is not a *cas fortuit extraordinaire*, an extraordinary as well as an unforeseen accident, within the meaning of article 2743 (2714), so as to justify an abatement of rent if the crop only is destroyed.

In the case at bar, the thing leased is a sugar plantation, with the buildings, mules and implements necessary for the cultivation and making of sugar, and the growing crop of sugar cane. This crop is not sold to the lessee absolutely, with the right to use and consume it as he pleases; but it is leased to him as part of the plantation, and to be replanted on the plantation as seed cane; and he expressly binds himself to do this, as well as, by way of reimbursing the lessor for this cane, to leave a certain amount of growing cane on the plantation at the end of the lease. These stipulations as to the growing cane leased with the plantation, and the growing cane to be left on the plantation at the end of the lease, do not constitute a separate contract of exchange of one thing for another, under article 2660 (2630) of the Louisiana Code; or a letting of moveables, or of things which cannot be used without being destroyed

by the use, within the meaning of article 2678 (2648); or a payment of rent in a portion of the crop, under article 2671 (2641). But they are parts and incidents of the principal contract of lease into which the parties have entered; and that contract is the lease of one entire thing, a sugar plantation, with growing cane upon it, and otherwise fit for the cultivation of sugar, to be used and enjoyed as such by the lessee until the end of the lease, and then to be returned by him to the lessor in like condition, barring such accidents as may excuse the lessee from the performance of the contract on his part.

The material facts regarding the cultivation of sugar cane, as appearing by the evidence returned with the master's report, are these: Sugar cane is propagated by cutting standing cane and planting it as seed cane. The cane so cut from one acre will plant not more than three acres. The plants that spring up from the seed cane are called plant cane; the roots from which cane has been cut are called stubble; and the shoots which spring up in the following years from those roots are called ratoons (*rejetons*), and are cut for sugar in the two years succeeding the first cutting, after which it is usual to plant the ground anew.

It also appears that the plaintiff at once performed the obligation, expressly assumed by him in the lease, of cutting the standing cane leased to him with the plantation, and planting it as seed cane; and that, when this cane was a little above the ground, the inundation took place, the facts concerning which, as stated in the master's report, were as follows:

The lessee, upon entering into possession under the lease, in the autumn of 1883, found the plantation in bad condition for want of proper drainage, and, in order to prepare the ground for the cultivation of sugar, dug a new canal and enlarged and deepened the ditches. Early in the spring of 1884, the Mississippi River made a crevasse in the levees opposite a neighboring plantation, and the waters coming through the crevasse overflowed the plantation leased. By reason of the overflow, the lessee lost the entire crop of sugar cane of 1884, the two hundred acres of stubble cane and eighty-five acres of plant cane were destroyed, the canals and ditches were par-

tially, and in some places wholly, filled up, and the bridges generally swept away. The whole plantation remained under water for three months; and when the waters went down, they left a deposit of from three to six inches in depth. To put the plantation in the condition in which it was at the time of the crevasse, and to fit it for cultivation as a sugar plantation in 1885, would require the canals to be opened or cleaned out, ditches to be redug, the bridges replaced, and seed cane to be obtained, all at considerable expense.

Upon comparing the master's report with the evidence taken in the case, the above appears to be a fair statement of the material facts, except that the master would seem to have overstated the number of acres of stubble cane, and understated the number of acres of plant cane; but that is immaterial, since there is no question of the whole amount of cane destroyed, or of its having been all the cane on the plantation.

But we cannot concur in the conclusions of the master and of the Circuit Court, that the property was neither destroyed, nor rendered unfit for the purpose for which it was leased; that the loss of the growing crop and the injuries to the plantation were not caused by an "unforeseen event;" and that the plaintiff was not entitled to relief. As the case is on the equity side of the court, it is not important to consider how far those conclusions involved inferences of fact, and how far they consisted of matter of law.

The object of this suit is not to obtain an abatement of rent, under article 2743 (2714) of the Civil Code of Louisiana, on account of the destruction of the crop; but it is to have the lease annulled, under articles 2697 (2667) and 2699 (2669), because the plantation has been destroyed or rendered unfit for the purpose for which it was leased.

That the breaking in and overflow of the waters of the Mississippi River was a fortuitous and unforeseen event, within the meaning of these articles, necessarily results from the reasons already stated, which need not be recapitulated. The remaining question is whether that event destroyed the thing leased, or rendered it unfit for the purpose for which it was leased. This question lies in smaller compass.

The plaintiff had hardly put the plantation in a condition suitable for the cultivation of sugar cane, which was the sole: purpose of the lease, and planted one crop, when the inundation came, putting the plantation under water for three months, filling up the canals and ditches necessary for its drainage, sweeping away the bridges, and leaving a deposit from three to six inches deep over the whole land, and making it necessary, in order to cultivate the thing leased as a sugar plantation the following year, to spend large sums of money to open and dig out canals and ditches and replace bridges; and also destroying all the stubble cane as well as all the plant cane, and leaving the plantation without any cane upon it, either to make sugar of, or to cut seed cane from for planting in succeeding years.

In short, the inundation left the thing leased in such a condition, that it was unfit for the purpose of a sugar plantation, for which it had been leased, and could not be made fit for that purpose without spending large sums of money to restore it to a condition fit for the cultivation of sugar cane, and to obtain seed cane elsewhere to start it afresh. It not only destroyed the whole crop for the year 1884, but it destroyed the plants which would otherwise have produced, both in that year and afterwards, cane for making sugar, as well as what was needed for seed cane, and destroyed the entire capacity of the plantation to grow cane and make sugar, until it should be restored to a condition fit for cultivation and planted anew. This was not a mere destruction of a crop for one year, like the destruction of a crop of wheat, or of grapes, or of apples; but it was more like the destruction of the vines, or of the apple trees, from which present and future crops are to be gathered.

Upon the whole case, we are of opinion that the lease being of a sugar plantation for the purpose of being used to cultivate sugar cane, the injuries proved to the plantation, and to its capacity for producing cane and sugar, amounted to a partial destruction of the plantation, or, what is the same thing in legal effect, to making it cease to be fit for the purpose for which it was leased; that those injuries were caused by a for-

tuitous or unforeseen event; and that under articles 2697 (2667) and 2699 (2669) of the Civil Code, construed in the light of the other articles that we have cited, and of the principles of the civil law, as established in Louisiana, the plaintiff was entitled to have the lease annulled. The decree of the court below dismissing the bill must therefore be reversed; and any equities of the parties which should affect the form of the decree may more conveniently be dealt with in that court.

*Decree reversed, and case remanded to the Circuit Court with directions to take such further proceedings therein as may be in conformity with law, and not inconsistent with the opinion of this court.*