LITTLE ROCK ICE COMPANY *v*. CONSUMERS ICE COMPANY.

## Opinion delivered October 26, 1914.

1. LEASES—DEFECTS IN PREMISES—ABANDONMENT.—A lessee can not abandon the leased premises because of defects which were discoverable by a reasonably careful examination.

2. LEASES—DEFECTS—ABANDONMENT.—Defendant leased an ice plant from plaintiff for a term of years. Before the expiration of the term the boilers became so defective that they could not be used with safety, and defendant abandoned the premises. *Held*, defendant was liable to plaintiff for the rent as it became due, in the absence of any showing of fraud on the part of the lessor.

3. DEFINITIONS—"EXPLOSION."—Explosion, as used in a lease of a manufacturing plant, and as applied to steam boilers means a sudden bursting or breaking up from an internal force.

4. LEASES—COVENANT TO REPAIR—BOILERS—EXPLOSION.—A covenant in a lease to repair a boiler in the event of an explosion, will not require the lessor to repair the boiler, where, before the expiration of the lease, it becomes so worn and thin as to be in danger of exploding, due to want of repair, natural decay or wearing out from use.

5. LEASE—MANUFACTURING PLANT—BOILERS—FRAUD AND CONCEALMENT. —Where lessor leased a factory to lessee, and before the expiration of the lease the boilers became useless, because of the danger of explosion, it can not be said that the lessor practiced any fraud on the lessee, when it appears that the boilers were inspected by an inspector whom it was agreed was competent, and pronounced in good condition, nor will the lessor be held to be guilty of concealment when he did not refuse the lessee permission to inspect the leased property, prior to the execution of the lease.

6. LEASES—MANUFACTURING PLANT—REPRESENTATIONS—EFFECT OF WEAR AND DECAY—BOILERS.—When the lessor of an ice plant represented to the lessees thereof that the same was capable of manufacturing forty tons of ice per day, and the lessee did for a time, after the lease manufacture that amount, the lessee will not later be relieved from the payment of the amount stipulated in the lease, because on account of the wear and decay of the boilers of said plant, he was not able to manufacture forty tons of ice per day.

Appeal from Pulaski Chancery Court; *John E. Martineau*, Chancellor; affirmed.

*W. H. Pemberton*, for appellant.

1. The note was void under the terms of the written contract of lease. 99 Ark. 193.

2. The note was void because the consideration for which it was given failed. When the notes were executed by appellant, there was an implied warranty on the part of appellee that the plant was and would continue to be suitable and usable for the purposes for which it was leased. 24 Cyc. 1201; 9 Cyc. 369; 11 Conn. 432; 11 Johns. 50.

3. The note was void because of the false and fraudulent representations made as to the condition of the plant and machinery, and especially of the boilers, by the president of the appellee company who acted for it in making the contract of lease. 55 Ark. 299; 2 Herman on Estoppel, § 788; 47 Ark. 335; Bigelow, Estoppel, 627; 93 Ind. 480; 103 Mass. 501; 38 Mo. 55; 58 Miss. 30; 74 Ark. 46-54; 99 Ark. 438; 98 Ark. 48; 96 Ark. 371.

*J. W. Blackwood,* for appellee.

1. There were no representations not shown in the lease. The evidence is clear and convincing that there were no false representations made.

2. The representations set out and relied upon by appellant were true in fact, *i. e.,* that the plant had produced forty tons of ice per day, that it was in good condition at the time of making the lease, with the exception of minor repairs, which were afterward made and accepted.

3. If representations were false, they must have been intentionally made and must have been fraudulent and relied upon by appellant to its injury, to avoid the contract. 22 Ark. 454; 23 Ark. 289; 95 Ark. 135; 30 Ark. 686; 11 Ark. 66; 19 Ark. 528; 47 Ark. 164; 17 Ark. 91; 95 Ark. 375; 101 Ark. 608; 74 Ark. 238; Bishop on Contracts, 664.

4. Even where the circumstances complained of are such as to justify the tenant in abandoning the property and in claiming a constructive eviction, he must do so in a reasonable time after the circumstances arise which give him the right to abandon, and if he fails to do so, he loses the right. 24 Cyc. 908; 46 Ark. 347, 348.

5.   A lessee is presumed to take only after examination. The maxim *caveat emptor* applies, and if he desires to protect himself in this regard, he must exact of the lessor an express stipulation as to the condition of the premises, or that they will remain in such condition during the term of the lease. Tiffany on Landlord and Tenant, 556, § 86; 109 S. W. 1044; 151 Mass. 207; 168 S. W. 219; 161 Mass. 504; 33 L. R. A. 449; 1 Ill. App. 620; 1 Daly 485; 48 Me. 316; 157 Fed. 229; 13 Wall. 379, 383; 20 L. Ed. 627; 95 Ark. 131; 40 Minn. 106.

6.   The lessee is not released from its covenant to pay rent by the wearing out of the boilers. The lessor did not agree, and it is not required to repair the boilers. 95 Ark. 131; 21 L. R. A. (N. S.) 130; 5 Cush, 226. Partial destruction of premises does not release the tenant. 25 Ark. 441; 99 Ark. 198; 160 U. S. 527; 108 Md. 501; 18 Am. & Eng. Enc. of L. 254.

7.   The only implied covenants in law are that the lessor had good title and that he will do nothing intentionally to injure or molest the beneficial enjoyment of the devised premises, There is no implied covenant that the premises at the time of the lease are in a condition of fitness for the use for which the lessee may propose to use them, nor that they will remain in repair during the term of the lease. 95 Fed. 340; 65 N. E. 63; 59 Mass. 230; 26 Atl. 101; 168 S. W. 219; 1 Tiffany on Landlord and Tenant, 556, 557, § 86.

8.   There is no express covenant or warranty in the lease that the plant was in good condition, and oral testimony can not be introduced to add to or vary the written terms, or to establish what the lessee understood. 154 S. W. (Ark.) 1140; 5 L. R. A. 400; 106 Ark. 350; 73 Ark. 431; 102 Ark. 333; 92 Ark. 504.

HART, J.   On the first day of April, 1907, the Consumers Ice Company, a domestic corporation, by a contract in writing leased its ice plant to the Little Rock Ice Company, also a domestic corporation, for the term of ten years, at an annual rental of $2,500 per year, payable in advance. Notes were executed for the rent and this

suit was instituted by the plaintiff, the Consumers Ice Company, against the defendant, the Little Rock Ice Company, to recover on the note for rent which matured on the first day of March, 1913.

The defendant answered and denied any liability on the note and averred that it had performed all of its undertakings. It alleged that the three boilers of the ice plant became so worn in 1911 that it became dangerous to use them and that they abandoned the ice plant because the plaintiff refused to replace or repair them. The defendant also alleged that the plaintiff had procured the execution of the lease by fraudulent representations.

On motion the cause was transferred to the chancery court, and, upon the hearing, the chancellor rendered judgment in favor of the plaintiff for the rent note sued on and dismissed the cross complaint of the defendant for want of equity. The defendant has appealed. The facts are substantially as follows:

In 1902 F. L. Riggs came to Little Rock and purchased a site for an ice plant. After the ice plant was erected the plaintiff corporation was organized and Riggs became its manager. At that time the defendant corporation was engaged in operating an ice plant about two blocks away from the site of the plaintiff's plant. Both plants continued in operation until the spring of 1907 at which time, by a contract in writing, the plaintiff leased to the defendant its ice plant in the city of Little Rock for the term of ten years at an annual rental of $2,500, payable in advance. The lease did not contain any covenant requiring the lessor to make repairs, but did contain the following covenant:

"In the event of loss by fire or boiler explosion, the lessor shall elect within a reasonable time, whether to repair damages, or cancel lease, and return notes for rent due, but rent shall continue until such election, and in event of election to rebuild, there shall be no rebate of any part of rent herein provided. Said repairs are to be executed in a reasonable time.

"And, in event the lessor elects to rebuild the plant, it shall be put in as good condition and have as much producing capacity as at time of fire or explosion."

In the negotiation for the lease, H. C. Daniels, president, and L. W. Cherry, treasurer, of the defendant corporation, represented it in making the lease, and F. L. Riggs represented the plaintiff corporation.

According to the testimony of the defendant, when F. L. Riggs first came to Little Rock he went by the name of F. Leonard. Afterwards Cherry learned that his real name was Riggs and his proper name was then assumed by him. Cherry and Daniels said that Riggs represented to them that the ice plant was capable of manufacturing forty tons of ice per day and that its boilers and other machinery were in good condition; that they began the operation of the plant as soon as they leased it and continued to operate until the year 1911, when the boilers became so thin and so badly worn out that it was dangerous to use them; that they notified the plaintiff to replace or repair them and that upon its failure to do so they would surrender the leased premises; that the plaintiff failed to repair the boilers; and that they abandoned the leased premises.

By other testimony it was shown that the usual life of a boiler in the city of Little Rock, with good care and attention, would be from twelve to eighteen or twenty years; that the boilers in question were used in a careful and skillful manner; and that, notwithstanding this, in 1910 they became badly worn and in 1911, by reason of decay, were totally unfit for use in the ice plant. During that year an inspection was made of them by the inspectors of the Hartford Steam Boiler Insurance Company and the inspectors reported that they were badly worn, contained patches in many places, were unfit for use in the ice plant, and were likely to explode at any time.

Other witnesses for the defendant testified that for a while after the premises were leased by the defendant thirty-eight tons of ice per day were manufactured, but that, by reason of the wearing of the boilers, the plant

for two or three years was incapable of manufacturing that amount of ice.

On the other hand, it was shown by the plaintiff that an inspection of the boilers had been made by it a short time before the lease was executed; that this inspection was made by the inspectors of the Hartford Steam Boiler Inspection and Insurance Company and that the inspectors reported that the boilers were then in good condition. It is shown by the witnesses for both parties that the inspectors of this insurance company were skillful and reliable men and that the report of an inspection made by them would be considered as reliable.

Riggs testified that when he came to Little Rock he went under the name of Leonard because Mr. Cherry knew that his father had been engaged in the ice business at other places and that he was afraid that if he made his identity known Cherry, on account of his influence, might throw obstacles in the way of establishing another ice plant in the city of Little Rock. He said that he did not refuse permission to the officers of the defendant corporation to examine the ice plant before the lease was executed; that its ice plant was situated about two blocks away and that he supposed the officers knew as much about the condition of the plant as he did.

On the other hand, Mr. Daniels stated that for several days prior to the execution of the lease, he spoke of making an examination of the plant, but that Mr. Riggs always had an engagement that prevented him from accompanying him. He states, however, that Mr. Riggs did not refuse him permission to examine the plant before the lease was executed.

Riggs also said that the plant was capable of manufacturing forty tons of ice per day at the time the lease was executed and that he, as its manager, had been manufacturing that amount of ice during the preceding year.

As we have already seen, there was no express covenant in the lease that the plaintiff was to repair the leased premises or to replace any machinery that might become worn out during the term of the lease. In the

case of *Delaney* v. *Jackson,* 95 Ark. 131, the court held that unless a landlord agrees with his tenant to repair leased premises he can not, in the absence of a statute, be compelled to do so.

It is the settled rule of the common law that there is no implied covenant by the lessor that the leased premises are in good repair or fit for the intended use, nor that the premises shall continue to be suitable for the lessee's use or business. 24 Cyc. 1048; *Horton* v. *Early,* 47 L. R. A. (N. S.) 314, and cases cited. *Clifton* v. *Montague,* 33 L. R. A. 449, and note.

In the case of *Viterbo* v. *Friedlander,* 120 U. S. 707, the court said that the common law regards a lease for years as an estate for years, which the lessee takes a title in to pay the stipulated rent for, notwithstanding any injury by flood, fire, or external violence.

In 24 Cyc. 1047, it is said: "It may be broadly stated that in the absence of fraud or concealment by the lessor of the condition of the property at the date of the lease, the rule of *caveat emptor* applies, since there is no implied warranty on the part of the landlord that the premises are tenantable, or even reasonably suitable for occupation."

In other words, in the absence of fraud or concealment, the tenant leases at his peril and the rule in the nature of *caveat emptor* throws upon the lessee the responsibility of examining the demised premises for defects and providing against their consequences, before he enters into the lease. *Watson* v. *Almirall,* 61 N. Y. App. Div. 429, 70 N. Y. Supp. 662.

This rule was applied in *Foster* v. *Peyser,* 9 Cush. (Mass.) 247, 57 Am. Dec. 43. In that case the contention was that a drain made a house so uninhabitable that the lessee abandoned it. This fact was held not to discharge him from the payment of the rent afterwards accruing.

(1-2)   In the application of this principle it follows that the lessee can not abandon the premises because of defects which were discoverable by a reasonably careful examination.

It will be noted that the lease contained a provision that in event of loss by fire or boiler explosion the lessor should elect within a reasonable time whether he would repair the damage or cancel the lease. The testimony shows that in 1911 the boilers became so thin by reason of decay that they were likely to explode at any time and that it was very dangerous to use them. The lessees notified the lessor of this fact and the lessor failed to repair or replace the boilers. It is contended by counsel for the defendant that because the boilers became so worn that they were likely to explode at any time that the lessor was bound to repair or replace them under the clause of the lease requiring him to repair damages from a boiler explosion; in other words, they claim that when the boilers became so thin that they were likely to explode by being used, that this was equivalent to an actual explosion. We do not agree with them in this contention.

In the case of *Kirby* v. *Wylie*, 108 Md. 501, 21 L. R. A. (N. S.) 129, the court held that the destruction of a building by gradual decay from natural causes is not an act of God, or damage by the elements within the meaning of a provision in a lease requiring the landlord to replace in case the building is destroyed by such an act.

In the case of *Harris* v. *Corlies* (Minn.) 2 L. R. A. 349, the lease contained a provision that if at any time during the term, the premises should be rendered partially untenantable by fire or the elements, that the landlord should repair them within a reasonable time. The premises, by reason of water percolating from springs through the walls of the basement, became so unhealthy as to be untenantable and the court held that the landlord was not bound to repair under the covenant. Mr. Justice Mitchell, who delivered the opinion of the court, said: "Every case of damage to or destruction of human structures, not caused by animal force, may, in one sense, be said to be caused by the elements, as, for example, ordinary gradual decay. But it would hardly be claimed that such a case would be within the meaning of the provisions of the lease. Or, suppose because of the manner

of its construction it should have proved, when winter arrived, that the basement was untenantable because of the cold, it would scarcely be urged that this came within the terms of the lease. We think that the language of the lease refers only to some sudden, unusual or unexpected action of the elements occurring during the term, such as floods, tornadoes or the like, extraordinary disasters not anticipated by either party, the efficient cause of which originated after the term began, and which either destroyed the building or left it in a materially and essentially worse condition than it was in when leased. We think this is substantially the sense in which such expressions in leases have always been used and in which they would now be ordinarily understood by business men in executing such contracts.''

In the case of *Bigelow* v. *Collamore,* 5 Cush. (Mass) 226, the facts were that a mill was leased for a term of years and the wheels became so rotten, out of repair and worn out as to be almost worthless. The lease contained a clause that in case the premises or any part thereof should, during the term, be destroyed or damaged by fire or other unavoidable casualty, so that the same should thereby be rendered unfit for use, then there should be a proportionate abatement of the rent until the premises should have been put in proper condition for use by the lessor. The court held, in effect, that if the water wheel of a mill which is the subject of a lease, breaks down by age, decay or want of repair, this is not an unavoidable casualty and the lessee continues liable for the rent.

(3)   Explosion means a sudden bursting or breaking up from an internal force. The explosion of a boiler has been defined to be ''the bursting of a boiler, the shattering of a boiler by a sudden and unusual pressure in distinction from rupture.'' *Louisville Underwriters v. Durland,* 123 Ind. 544, 7 L. R. A. 399.

(4)   It will be seen that in the lease under consideration the provision is that in event of loss by fire or boiler explosion the lessor shall within a reasonable time

make repairs. Looking at the connection in which the word explosion stands, it clearly refers to damage done to the boiler by a sudden bursting of it which could not be reasonably foreseen by human agencies, and does not signify a mere want of repair or natural decay or wearing out arising from lapse of time or improper use of the boilers.

In the case of *Delaney* v. *Jackson, supra,* the court held that in order to vitiate a lease contract on the ground of fraudulent misrepresentations, such misrepresentations must relate to a matter material to the contract and in regard to which the other party had a right to rely and did rely to his injury. The court further held that if the means of information as to the subject of the representation is equally accessible to both parties, they will be presumed to have informed themselves; and if they have not done so they must abide the consequences of their carelessness.

(5) The witnesses for both parties admitted that the inspectors of the insurance company which inspected the boilers in 1907, just before the lease was executed, were competent and reliable men. It was conceded that whatever report they might make would be regarded as representing the true state of facts. The inspection made at that time shows that the boilers were in good condition. The testimony also shows that it was necessary to go into the boilers and make a careful examination of them before their true condition could be ascertained and that the inspectors did this and reported them to be in good condition. Therefore, it can not be said that Riggs made any false representations as to the condition of the boilers.

There was no fraud by concealment because Riggs did not refuse permission to the officers of the defendant corporation to examine the boilers.

(6) The defendant corporation was engaged in the ice business about two blocks away and had been prior to the time the plaintiff corporation erected its plant. Riggs was under the belief that the officers of the de-

fendant corporation knew, in a general way, the capacity of the plant. For at least a part of the time prior to the execution of the lease, while both corporations were engaged in manufacturing ice, by agreement each delivered the ice manufactured by it to a selling agent and from this fact, and from the proximity of the ice plants, Riggs might well assume that the officers of the defendant corporation knew in a general way the capacity of the plaintiff's plant. Besides, Riggs testified that at the time the lease was executed the plant was capable of manufacturing forty tons of ice per day, and, as a matter of fact, the defendant corporation did manufacture nearly that amount after it took charge of the plant under its lease. The loss in capacity of the plant arose from the fact that the boilers, through decay and old age, became worn out. As we have already seen, the lessee having failed to provide against such a contingency, must suffer the consequences of its neglect and is liable for the rent accruing after the boilers became worn to such an extent that it was dangerous to use them.

The decree will, therefore, be affirmed.