ACOSTA ET AL., PLAINTIFFS AND APPELLANTS, *v.* PORTO RICO TELEPHONE COMPANY, DEFENDANT AND APPELLEE.

APPEAL from the District Court of Mayagüez in an Action for Performance of Contract and Damages.

No. 2115.—Decided January 24, 1921.

LEASE—RESCISSION OF LEASE—VIS MAJOR.—When the tenement is destroyed or rendered useless without fault on the part of the tenant, his right of rescission must be governed by the general rules applicable to the rescission of contracts. Hence, when a leased house becomes uninhabitable through *vis major,* the lessee may vacate it and refuse to pay the rent, especially if he has given due notice to the lessor, and is not required first to bring a rescissory action.

ID.—EVIDENCE—PHOTOGRAPH.—A photograph offered in evidence for the purpose of showing that the walls of a building were not out of plumb, without further showing, is not admissible.

The facts are stated in the opinion.

*Mr. B. Forés* for the appellants.

*Messrs. Charles Hartzell* and *F. Ramírez de Arellano* for the appellee.

MR. JUSTICE WOLF delivered the opinion of the court.

Magdalena Acosta Forés was the owner of a two-story house of *mampostería* at 86 Luna Street of San Germán. She rented the second story of this house to the South Porto Rico Telephone Company, which was succeeded as lessee by the Porto Rico Telephone Company. The terms of the lease ran until the 31st day of May, 1924.

As a result of the earthquake of October 11, 1918, and of November 12 of the same year, and by reason of the attitude or acts of various authorities and of the attitude of its own employees, the defendant company thought it had a right to abandon the house and to declare the contract of lease rescinded. The lessor, maintaining that the house was neither ruined nor rendered uninhabitable by the action of the earthquakes, brought this action to compel the defendant to go on with the contract or to pay the complainant the sum of $1,320 which she estimated as damages.

The suit is in no sense one for the payment of rent due or overdue. Issue, it may be said, was only had on whether the house was or was not ruined or rendered uninhabitable. The district court found that by reason of the earthquakes of October 11 and November 12 of 1918, the house was so cracked, out of plumb and practically in ruins, that the lessee had to abandon it, inasmuch as the house was useless for the purpose for which it was destined, and that the abandonment of the house was ordered and advised by the mayor of the city of San German and by the Assistant Commissioner of the Interior. From these facts the court concluded that if a thing is so destroyed or prejudiced that the lessee may not use or enjoy the same, then the contract is automatically rescinded; that it was shown that the house suffered damages to such an extent that it would be impossible to continue using it for the object required and that even if it had been possible to repair the same it would never be the same house which had been leased, inasmuch as it could not offer the same guarantees and security; that given the nature of the telephone service, it would be impossible to abandon the house temporarily to use it three or four months thereafter, because it would be necessary to suspend the public service for an indefinite time, with great damage to the telephone company and to the public in general; that the court did not think it necessary in a case of this kind to begin a preliminary judicial proceeding to rescind the contract; that it was not the case of an ordinary normal rescission or of the convenience or prejudice of one or both of the parties, but a sudden destruction of the thing leased and for that reason it was substantially impossible to begin a proceeding of rescission in circumstances so abnormal.

On appeal from the judgment various errors are alleged. For convenience of development we shall discuss first the question of whether it was necessary for the tenant to begin a suit to rescind the contract of lease. The sections of the

Civil Code which the appellant cites to maintain her position that such a suit was necessary are as follows:

"Section 1457.—The lessor is obliged:

"1. To deliver to the lessee the thing which is the object of the contract.

"2. To make thereon, during the lease, all the necessary repairs in order to preserve it in condition to serve for the purpose to which it was destined.

"3. To maintain the lessee in the peaceful enjoyment of the lease during all the time of the contract."

"Section 1459.—If the lessor or lessee should not comply with the obligations mentioned in the preceding sections, they may request the rescission of the contract and indemnity for losses and damages, or only the latter, leaving the contract in force."

"Section 1461.—If, during the lease, it be necessary to make any urgent repairs in the thing leased which can not be postponed until the expiration thereof, the lessee shall be obliged to permit the work, even though it be very annoying to him, and even if during such repairs he may be deprived of a part of the estate.

"If the repairs should last more than forty days, the price of the lease shall be reduced in proportion to the time and to the part of the estate of which the lessee is deprived.

"If the work should be of such a nature that the part which the lessee and his family require for a dwelling becomes uninhabitable, he may rescind the contract."

Undoubtedly, although they do not distinctly say so, these sections indicate that in some of the cases that they cover a suit is contemplated and to some extent the commentators and the cases point in the same direction. Manresa, Volume 10, page 553; Scævola, Volume 24, *passim; Henry Rose Mercantile & Manufacturing Company* v. *Smith,* 139 La. 224, and cases cited therein. Is such a suit imperative on the part of the tenant or has he a privilege? Does the necessity or privilege cover all cases? One thing is immediately to be noticed, namely, that these sections contemplate that the tenant can and does remain in possession of the leased property. These sections presuppose the continuance of the lease,

and the action of the tenant is to cancel the contract because a landlord has failed to perform one of the incidents of the said lease. But if the thing leased is destroyed or becomes untenantable, we find nothing in the Civil Code that makes a suit for rescission imperative. Section 1459 shows that if the landlord fails to comply with the terms of the lease the tenant may ask a rescission, but section 1461, at the end, says the lessee may rescind. Likewise, sections 1150 and 1152 of the Civil Code provide as follows:

"Section 1150.—An obligation, consisting in the delivery of a specified thing, shall be extinguished when said thing should be lost or destroyed without fault of the debtor and before he should be in default."

"Section 1152.—In obligations to do, the debtor shall also be released when the prestation appears to be legally or physically impossible."

In other words, where the thing is destroyed or rendered useless without the fault of the tenant, the right of rescission on the part of the tenant must be governed by the general rules governing the rescission of contracts. Rescission does imply an active step on the part of the tenant, but this may merely consist in notice to the landlord and probably by moving from the premises. Where the thing is rendered untenantable and the tenant can in no wise enjoy the same, we think he may vacate and refuse to pay the rent, especially if he duly notify the landlord, as was done in this case.

Section 1261 of the Civil Code, in a chapter relating to rescission of contracts, provides:

"Section 1261.—The action for rescission is a subsidiary one; it may be enforced only when the person injured has no other legal remedy to obtain reparation for the injury."

So that the code itself contemplates other measures besides suit.

Likewise, apparently, where the Civil Law holds, as in

Louisiana, the tenant may, in cases like this, resist an action for the rent. *Denman* v. *López,* 12 La. Ann. 822.

In his comments on section 1554 of the Civil Code, equivalent to section 1457 of our own, Manresa discusses the obligation of the landlord to repair:

"This question has been discussed by the French jurists. Tropling, basing his opinion on the obligation of the lessor to make the repairs, says, in substance, that all repairs of whatever nature must be made by the lessor. The lessor should keep the property in such a condition that it may serve the purpose for which it is intended: therefore, any defect, great or small, whether caused by a fortuitous event, or by any other cause, should be repaired. The result of this reasoning is that if the property is destroyed the lessor should rebuild it.

"Nothing is more absurd than this manner of considering the question. A property owner who leases his property cannot be required to have a reserve capital for rebuilding the property if it is accidentally demolished, or to borrow it at ruinous rates. It is precisely for reaching a harmonious solution under such circumstances that the rule set forth in section 1487 by the Bill of 1851 was established, drawing a distinction between the total destruction of the property, which rescinds the contract, and its partial destruction, which permits the lessor to elect between the rescission of the contract and the proportional reduction of the rent.

\*    \*    \*    \*    \*    \*    \*

"In the event of the destruction of the property there is no special provision in the code, except section 1568. Undoubtedly its purpose was to leave the solution to the general principles governing obligations, as hereinafter to be shown. According to these principles, the loss of the property (which is equivalent to its destruction), extinguishes the obligations created therefrom. In our opinion there is no other possible solution within the provisions of the Code." Manresa, Spanish, Civil Code, Vol. 10, pp. 520, 521.

See also the case of *Henry Rose Manufacturing Company* v. *Smith,* 139 La. 224.

Now, if the landlord may treat the contract as rescinded and simply refuse to act, the same reciprocal right to resist payment is inherent in the tenant when the thing is destroyed.

Here, moreover, the landlord, rightly or wrongly, has haled the tenant into court, and, supposing that an action of the sort invoked lies, it is impossible to concede that what the landlord asks the court to declare existent the tenant may not resist or defend on the ground of its being non-existent by reason of what has happened. Supposing, then, the action to lie, the whole right of the landlord to a judgment against the tenant revolves around the point of whether the thing leased was or was not rendered untenantable or unfit for occupancy. Most of the other errors alleged by the appellants, all without a distinct assignment of errors, depend upon this question.

The court had a right to infer from the evidence as a whole that the house was uninhabitable or untenantable, which we deem are for most purposes equivalent terms. But there is more. The house was originally leased to a telephone company. There was evidence tending to show that it was a regular telephone service with a long distance and public telephone included. Besides this, two or more of the telephone girls lived in the house. The mayor of the town advised these girls to move on account of the danger produced by the earthquakes.

It is true that the owner of the house offered to make repairs after the first shock and that the superintendent of the telephone company said that the repairs might be deferred, but the court had a right to believe, even if there was direct evidence to the contrary, which the record does not disclose, that the physical situation was rendered much worse and the danger rendered much greater by the repeated shocks, so that if there was any duty on the landlord, which, as we have seen, is denied by the best authorities, that duty was not affected by the attitude of the superintendent. Indeed, his attitude could have no effect under the law, because when there is a duty to repair, then by virtue of section 1461 of the Civil Code the tenant is bound to tolerate the

repairs. We were saying that this was a telephone company with a complete service. The court found, and there was evidence tending to show, that it would be necessary to remove the whole apparatus to another building and then to move it back—a very costly operation as the superintendent testified. The whole record tends to show that such a moving was indispensable, and we do not find that the appellant even disputes these facts. Her witnesses gave testimony tending to show that by working hard, day and night, the repairs might be made in less than a month and a-half, the limit of time fixed by the expert, Blás Silva, but the court had a right to find, seeing that the opinion of the experts so tended, that the repairs would take three or four months. We all know by experience that when materials are needed and especially now, the larger estimate is generally not too long. With all these repairs going on it was clearly impossible for the company to stay in the building.

It is true, as the appellant alleges, that the authorities did not say that the house was in a ruinous condition. We conclude that the building was rendered untenantable because the work that the landlord offered to do would amount to reconstruction and not to mere repairs, and this conclusion is supported by Manresa, *supra; Viterbo* v. *Friedlander,* 120 U. S. 707, and *Henry Rose Manufacturing Company* v. *Smith,* 139 La. 224. We also conclude that by reason of the business of the lessee being that of a telephone company, it could not continue its service there while the building was in a perilous condition, even if this fear was to some extent unreasonable. We conclude, moreover, that in order to make the repairs that the landlord offered to do, it would be necessary for the telephone company to move from the building to await the consummation of the repairs and then move back, which, in itself, admits an untenantable state of the building.

To support the conclusions of fact at which we have ar-

rived we have an incomplete record of the testimony. The documentary proof was never certified to by the judge, but merely added to the transcript, and we have no authority to consider it. Some of it related to the notices. given by the mayor; some of it to the correspondence of the parties. On one page the mayor appears to be counseling the girls to stay in the building and the context is convincing that he advised them to move, the word "not" being omitted. There are innumerable misspelt words whose correct meaning has to be divined. The testimony of Blás Silva, as transcribed, is sometimes so little clear as to leave us in doubt as to whether it was faithfully reproduced in the statement of the case. As all the evidence is not duly before us and as there are numerous omissions and misprints, the presumption in favor of the findings of the court could be rebutted, if at all, only with great difficulty.

We have, too, assumed that the lessor had a cause of action in this case if the house was indeed habitable, but if her claim was well founded, then the lease was existent and she only had a right to the maturing rent of which apparently at the time the suit was brought not a full month had accrued. The action not being one for rent, there was no cause of action. Even if part of the rent was due, as it was necessarily less than $500 the District Court of Mayagüez was without jurisdiction.

There was another error alleged with regard to the failure to admit photographs. As the sole object was to prove that the building was not noticeably out of plumb, we think the court entirely justified in holding, without more showing by the appellant, that a photograph was unavailing for that purpose inasmuch as the angle of exposure would make a radical difference.

The judgment must be

*Affirmed.*

Chief Justice Hernández and Justices Del Toro and Aldrey concurred.

Mr. Justice Hutchison concurred in the judgment.