O’NIELL, C. J.
 

 This is a suit to recover $5,000, deposited as earnest money to guarantee the fulfillment of a contract on the part of the defendant Ellis Variety Stores to sell to the plaintiff, Morgan
 
 &
 
 Lindsey, and on the part of Morgan & Lindsey to buy, the merchandise and store fixtures in four stores belonging to the Ellis Variety Stores. According to the terms of the agreement, the money was deposited by Morgan & Lindsey in the First National Bank of Lake Providence, La. Hence the bank was made a defendant in the suit. It was dismissed on an exception of no cause of action, but, on appeal, the judgment was reversed, and the case was remanded for trial on its merits. Morgan & Lindsey v. Ellis Variety Stores et al., 168 La. 1073, 123 So. 717.
 

 
 *201
 
 The contract for the sale of the stores was evidenced by an act passed before a notary public and two witnesses, on the 8th of April, 1927. The contract was for the sale of the defendant’s stores, located, respectively, at Lake Providence, La., at Tallulah, La., at Ferriday, La., and at Eudora, Ark. The price was to be the cost of the store fixtures, and $1.15 for every dollar of cost of the merchandise, up to $17,000, and the actual cost beyond that amount — the cost to be determined by adding 7 per cent, for freight and drayage to the invoice price of the goods.
 

 It was agreed and understood — as in fact it had to be agreed and understood — that the parties to the transaction would comply with the provisions of Act No. 270 of 1926, p. 464, known as the Bulk Sales Law. Hence it was stipulated that, at least ten days before the completion of the transfer, the parties would do the following things, required by the statute to be done “at least ten days before the completion of any such transfer, or the payment of any consideration therefor,” viz.:
 

 (a) That they would jointly make a full and detailed inventory, showing the quantity, and, so far as possible with the exercise of reasonable diligence, the cost! price to the transferor of each article to be included in the sale.
 

 (b) That the transferor would deliver to the transferee a written statement, sworn to, of the names and addresses of all of the creditors of the transferor, with the amount due or to become due to each of them.
 

 (e) That, immediately after the making of the inventories and receiving of the list of creditors, the transferee would notify personally or by registered mail each creditor appearing on the list, of the terms and conditions of the proposed transfer, the consideration to be paid, and the time set for the transfer, and would send to each creditor a copy of the list of creditors, etc.
 

 It was stipulated that the making of the inventories should begin on or before the 18th of April, 1927, and be proceeded with as fast as possible until completed, and that the transfer and delivery of the property should be made on the 16th of May, 1927, provided the parties had not by mutual consent completed the transfer and delivery before that date.
 

 The stipulations concerning the deposit' of the $5,000 as earnest money were as follows:
 

 “The promise of said Morgan & Lindsey, herein set forth, and its obligation to purchase the said above described property a.s herein provided for, is declared by the parties hereto to be made with the giving of earnest in the sum of Five Thousand Dollars ($5,000.00), which earnest money has this day been deposited by said Morgan & Lindsey in the following manner, to-wit: Said Morgan & Lindsey have paid to the First National Bank of Lake Providence, Louisiana, said sum of Five Thousand Dollars ($5,000.00), and this original contract has been delivered to said First National Bank of Lake Providence, Louisiana, by the parties hereto contemporaneously with said payment of Five Thousand Dollars ($5,000.00), and said First National Bank of Lake Providence, • Louisianá, is hereby instructed to hold the original Of said contract, together with said sum of Five Thousand Dollars ($5,000.00), subject to the joint written order of the parties hereto until the 16th day of May, 1927, inclusive,
 
 *203
 
 and, if-the said bank has not received a joint written order from the said parties hereto for said original contract and said sum of Five Thousand Dollars ($5,060.00) before the 16th day of May, 1927, inclusive, the said bank is authorized to deliver to said. Ellis Variety Stores on the 17th day of May, 1927, the said original of said contract, together with said sum of Five Thousand Dollars ($5,000.00) deposited by Morgan & Lindsey as earnest money, as herein set forth.”
 

 It was stipulated that, in the event of the completion of the sale and delivery of the property as provided for, the Ellis Variety Stores should transfer to Morgan & Lindsey, with full subrogation, and without further consideration, all of their rights as lessees of each of the four store buildings, and that Morgan & Lindsey would assume all of the obligations of the lessees from and after the transfer. And, in that connection, it was stipulated, as a condition of the contract, that, if the Ellis Variety Stores could not legally transfer their rights as lessees of the four buildings in which they were conducting their business, “then, and in such event, this entire contract shall be null and void, and said Ellis Variety Stores shall not be entitled to the earnest money herein provided for.”
 

 . The First National Bank of Lake Providence signed at the end of the contract an acknowledgment of receipt of the contract and of Morgan & Lindsey’s check for $5,000, payable to the order of the bank, and consented to hold the contract and the proceeds of the check, on deposit, subject to the stipulations of the contract.
 

 " In consequence of a crevasse in the levee . on the bank of the Mississippi river, which occurred on the 3d of May, 1927, above and near Tallulah, and which inundated that part of the state, including Tallulah and Ferriday, the contract between the plaintiff and defendant was not carried out. The plaintiffs contend that the flood rendered it virtually impossible for the parties to comply with the provisions of Act No. 270 of 1926, requiring the completing of the inventories, etc., before the 7th of May, 1927, in order to make it possible, legally, to make the transfer on the date stipulated, May 16, 1927. In that connection, plaintiffs aver that the representatives of the Ellis Variety Stores recognized, on the date of the crevasse, the impossibility of carrying out the contract, and abandoned the making of the inventories, and made no further attempt at performance or tender of performance of the contract, and that, if any one was in default in the failure to carry out the contract, the Ellis Variety Stores were in default. The defendants, on the contrary, contend that the plaintiffs purposely lagged .in the making of the inventories, and, on the 3d of May, 1927, immediately after the occurrence of the crevasse, willfully abandoned the making of the inventories, and the doing of the things required by the act of 1926 to be done on or before the 6th of May, in order for the transfer to be made lawfully on or before the 16th of May, 1927, the date stipulated in the contract. The district judge found the defendants’ contentions well founded, and found that they were not in default.
 

 If the plaintiffs were in default in the failure to carry out the contract, and if the defendants were not in default, the judgment, forfeiting the plaintiffs’ earnest money, is correct; otherwise it is wrong.
 

 
 *205
 
 The judgment rejecting the plaintiffs’ demand against the First National Bank of Lake Providence is correct, because the bank merely held the money under and by virtue of a mandate, and paid over the money to the Ellis Variety Stores on the 17th of May, 1927, in strict obedience of the terms of the mandate. The situation was then the same as if the earnest money had been paid originally to the party under obligation to sell, the party to whom, ordinarily, earnest money is paid, when there is a giving of earnest money, under the provisions of article 2463 of the Civil Code. Manifestly, the reason why the so-called earnest money was not paid originally to the Ellis Variety Stores, but was deposited in the bank, was that Act No. 270 of 1926 forbids the payment of any part of the price or consideration for a so-called bulk sale until ton days after the making of the inventory and the notifying of the creditors of the transferor, etc. The depositing of the $5,000 in the bank, to be paid over to the Ellis Variety Stores after the expiration of the time limit for the making of the sale, was therefore more in the nature of the depositing of liquidated damages agreed upon by the parties to be paid as a penalty for a violation of the contract, if either party should violate it.. But, when Morgan & Lindsey signed the agreement that the bank should pay over the money to the Ellis Variety Stores on the 17th of May, 1927, unless the parties to the contract mutually agreed to withdraw the deposit sooner, Morgan & Lindsey thereby agreed to look to the Ellis Variety Stores, and not to the bank, for the return of the money, if Morgan & Lindsey should demand the return of it after the 16th of May, 1927. The judgment appealed from is therefore correct, as far as the bank is concerned.
 

 We do not find that there was any willful lagging, on the part of either party to the contract, in the making of the inventories, previous to the crevasse, which occurred on the 3d of May, 1927. Three members of the firm of Morgan & Lindsey, namely, B. G. Lindsey and R. D. Hudiburg, of Jasper, Tex., and J. A. Russell, of Natchitoches, La., came to Lake Providence on the 18th of April, 1927, to represent their firm in the making of the inventories. C. B. Ellis, a member of the partnership styled Ellis Variety Stores, resided in Lake Providence, and was to represent his firm in the making of the inventories. The only other member of the firm was John T. Ellis, who resided in Ferriday. O. B. Ellis suggested, to Lindsey and Hudiburg and Russell that the stock of goods at Ferriday be inventoried first. 1-Iis purpose was to relieve John T. Ellis of the management of the'Ferriday store, so that he might assist in making the inventories of the three other stores; but C. B. Ellis did not explain to Lindsey and Hudiburg and Russell why he. (Ellis) preferred to inventory the stock in the Ferriday store first; and Lindsey and Hudiburg and Russell said that they preferred to begin by inventorying the stock in the store at Lake Providence, where they were, before going elsewhere. Ellis consented to inventorying the stock in the store at Lake Providence first; and the work was commenced that evening, April 18, 1927; at 7 p. m., and was finished on the next Saturday afternoon, the 23d of April. It is argued that all of the four inventories' would have been made before the crevasse occurred if the stock in the store at Ferriday had been inventoried first, as sug
 
 *207
 
 gested by O. B. Ellis; but the fact is — as disclosed by the testimony of Mr. Ellis and his wife — -that he consented to making the inventory at Lake Providence first. From Lake Providence O. B. Ellis and Lindsey and Hudiburg and Russell went to Eudora, Ark. The making of the inventory was commenced there on Monday the 25th of April, and was finished late that night, in fact at 1 o’clock a. m. on the 26th of April, and C. B. Ellis and Lindsey and Hudiburg and Russell left immediately for Lake Providence, and arrived .there at 2 a. m. on Tuesday the 26th of April. Later that morning Ellis informed Lindsey that there was a registered letter for him at the post office. The letter was from the headquarters of Morgan & Lindsey, Jasper, Tex., ¿nd requested Lindsey to return to Jasper and Hudiburg and Russell to go to Monroe, La., on urgent business for the firm. Ellis consented to their going, with the understanding that they would meet him in Tallulah, La., as soon as they could do so, to commence making the inventory there. It appears that Tallulah is about 30 miles south from Lake Providence, and Ferriday is about 75 miles south from Tallulah. According to the agreement with O. B. Ellis, Lindsey wont from Lake Providence to Jasper, Tex., on Tuesday the 26th of April, and Hudiburg and Bussell went to Monroe on the same day; and the three returned to Tallulah on the afternoon of Saturday the 30th of April, after notifying Ellis to meet them there on that day. He came that afternoon at 5:30, and suggested commencing, the inventory at Tallulah that night, but Lindsey was suffering from a cold and headache, and requested that the work be deferred until the next morning, which Ellis readily consented to.. On Sunday morning Ellis again suggested commencing the inventory, but Lindsey was confined to his bed with illness, and Ellis consented to postpone the making of the inventory until Monday morning. The work was commenced on Monday morning the 2d of May, and was finished that night about 10 o’clock, except for the calculations which had to be made on an adding machine and a Monroe calculating machine, which machines the Morgan & Lindsey representatives had brought with them from Texas. The calculations were completed at the hotel the next morning, Tuesday the 3d of May, 1927, about 9 o’clock. Ellis was present, and one of the Morgan & Lindsey representatives asked him what time the train would leave for Ferriday. Ellis said that he thought it would leave in the afternoon; but, at the suggestion of one of the Morgan & Lindsey representatives, Ellis telephoned to the station agent and learned that the only train going to Ferriday that day had left on schedule time, which was 9 a. m., and it was then 9:15. Ellis then went out to find a conveyance to take him and the three Morgan & Lindsey representatives to Ferriday. He found a public conveyance, being a seven-passenger automobile, in which there were already four passengers and the driver, going to Ferriday. He brought the conveyance to the hotel and requested the Morgan & Lindsey representatives to get into it with him and go on to Ferriday; but the driver of the car said that he could not take any of the passengers’ baggage; and the Morgan & Lindsey representatives were unwilling to leave their baggage and adding machine and calculating machine in Tallulah, and said that they preferred to wait and go to Ferriday by rail the next morning. It was then agreed that O. B.
 
 *209
 
 Ellis and the three representatives of Morgan & Lindsey would take the 9 o’clock train for Ferriday the next morning, Wednesday the 4th of May, 1927. It was known that it would take only one day to make the inventory there. Ellis left the hotel, and about ten minutes later the crevasse occurred, just above Tallulah, and the fire siren and other whistles began blowing, as a warning that the levee had broken and that the town would soon be flooded. The inhabitants were greatly alarmed and anxious to get away with such of their personal effects as they could take with them. Lindsey and Hudiburg and Russell, being-strangers in that part of the country, took their grips and went out upon the street in search of Ellis, to learn what his intention was. They met Ellis near the corner of the courthouse square, greatly excited, and apparently hurrying to leave town. The conversation which took place then between the Morgan & Lindsey representatives on the one hand and C. B. Ellis on the other was very brief, but it is highly important in the decision of this case, because there remained then only three days in which to make the Ferriday inventory and to do the other things required by Act No. 270 of 1926 in time to make the contemplated sale legally on the date stipulated. Russell and Hudiburg testified that, when they met Ellis, he immediately told them that he had just come from the railroad station, and that a train — a mixed train —was being held to take the refugees out towards Monroe, through Delhi, and that they (Lindsey and Hudiburg and Russell) could go out on that train, and that Ellis said that he was looking for a conveyance to take him to Lake Providence; and that Ellis hurried away, saying: “So long, boys, I’ll see you later.” Lindsey and Hudiburg and Russell then went to the Illinois Central Railroad station and helped the refugees loading their household furniture and effects upon the train, which left that evening at 5 o’clock. Lindsey and Hudiburg and Russell rode in one of the freight cars to Monroe, via Delhi. C. B. Ellis testified that when the whistles sounded the alarm that the levee had broken he went immediately to the Missouri Pacific Railroad station and asked the agent if a mixed train would be run south to Ferriday that afternoon, and the agent replied that there would be no train service that way. Ellis testified that'he then returned towards the hotel, and on his way met Lindsey and Hudiburg and Russell. Ellis’ version of the conversation which occurred then is that one of the three Morgan & Lindsey representatives said, “Ellis, we will see you laterthat he asked them where they were going; that one of them replied that they were going to take the train that went through Delhi to Monroe; and that he (Ellis) made no reply. It was then about 1:30 o’clock. The whistles had commenced blowing at 1 o’clock. Mr.. Ellis admitted, in his testimony, that he did not then or thereafter make any demand upon the representatives of Morgan & Lindsey, or make any request of them, to go to Ferriday and make the inventory of the store there; and he testified that the reason why he did not then or thereafter mention going toFerriday was that he understood, when he and the Morgan & Lindsey representatives parted in Tallulah, on the 3d of May, 1927, that the Morgan & Lindsay representatives were abandoning the idea of making an inventory of the stock of goods in the Ferriday store, and were therefore abandoning the in
 
 *211
 
 tention of buying the four stores. Russell and Hudiburg, on the other hand, testified that, when they and O. B. Ellis parted in Tallulah on the 3d of May, 1927, and he said that he was returning to his home in Lake Providence, and said nothing about making an inventory of the goods in the store at Ferriday, and considering that only three ■ days remained in which to make the inventory and to do the other things required by the act of 1826 to be done on or before the 6th of May in order for the sale to be made lawfully on the 16th of May, 1927, and considering that the town of Ferriday was then, practically if not absolutely, inaccessible, they (the representatives of Morgan & Lindsey) believed that C. B. Ellis himself was abandoning the idea of making an inventory of the stock in the Ferriday store, and was therefore abandoning, or acquiescing in the abandonment of, the contract for the sale of the four stores.
 

 We have related in detail the events occurring during the making of the inventories, from the 18th of April to the 3d of May, 1927, because the district judge based his judgment largely upon his finding that it was through the plaintiffs’ fault that the inventories were not completed before the crevasse occurred. There would have been no necessity for completing the inventories before'the 3d of May if the crevasse had not occurred. It is true that the parties realized, during the making of the inventories, that there was great danger of a crevasse occurring; but it does not appear that the representatives of Morgan & Lindsey delayed matters on that account. On the contrary, their showing up in Tallulah on the 30th of April, 1927, and phoning O. B. Ellis to meet them there, after Lindsey had gone to Jasper, Tex., and Hudiburg and Russel had gone to Monroe, La., was an evidence of their good faith in trying to complete the inventories within the time required by the contract, as governed by the act of 1926. Another evidence of the good faith of the Morgan & Lindsey representatives lies in the fact that they drove from Eudora, Ark., to Lake Providence, La., between 1 and 2 o’clock in the morning of April 26th, having finished the inventory at Eudora at 1 o’clock that morning. The reason for making the trip at that unreasonable hour was that the flood stage was such that it was feared that it would be impossible to make the trip later in the day. The bridge on which they crossed Bayou Macon was weighted down to prevent its floating away, and the water was over the bridge. The representatives of Morgan & Lindsey were not alone in asking for time out during the making of the inventories. On Thursday afternoon the 21st of April, during the making of the inventory at Lake Providence, O. B. Ellis received a
 
 telephone
 
 message from Tallulah, saying that it was feared that the levee might break there at any moment, and asking him to come there at once. The Morgan & Lindsey representatives consented to his going to Tallulah, and they went fishing during his absence of four hours.
 

 The store at Lake Providence was closed as soon as the inventory there was completed, and a sign, which the Morgan & Lindsey representatives had brought with them for the purpose, was placed in the window, announcing that the store was taken over by Morgan & Lindsey. The store at Eudora also was closed as soon as the inventory there was completed.
 

 
 *213
 
 There is very little conflict in the testimony in this case; and it loaves no doubt that the immediate cause of the failure of O. B. Ellis and the Morgan & Lindsey representatives to make an inventory of the merchandise in the store at Ferriday was that they missed the train that left Tallulah at 9 a. m. on the 3d of May, 1927, the day on which the crevasse occurred. The missing of the train was not any more the fault of the Morgan & Lindsey \ representatives than it was the fault of C. B. Ellis, if in fact it was as much their fault as his. They lived many miles away, and were strangers in Tallulah; and he lived near there, and had a business establishment there, as well as at Ferriday. I-Ience the Morgan & Lindsey representatives were justified in depending upon Ellis to pay attention to the train schedule from Tallulah to Ferriday.
 

 The defendants refer to the fact that John T. Ellis was in Ferriday and in charge of his firm’s store there on the 3d of May, and remained there until the 15th of May, 1927. That is true, but it was virtually admitted by him and his brother, O. B. Ellis, that it was npt intended that John T. Ellis was to represent the firm in making the inventory at Ferriday. He testified that his brother, O. B. Ellis, telephoned to him qn the 4th of May, 1927, that the representatives of Morgan & Lindsey had left, and, in consequence of the telephone message, he made a list or inventory of the goods in the store and stored them in the second story of the building, to avoid their being ruined by the flood. The inventory was not sent to Morgan & Lindsey, and was not such ,an inventory as was contemplated in the contract for the sale of the stores, but was made, as we understand, only for the purpose of keeping a record of the goods that were stored away until the flood would subside. The flood from the crevasse in the Mississippi river levee above Tallulah did not reach Ferriday until the 11th or 12th of May, 1927, but the flood water from the rivers and bayous west of Ferriday was about three feet deep in the town on the 3d of May, 1927.
 

 O. B. Ellis and John T. Ellis both admitted in their testimony that no demand was made upon Morgan & Lindsey or their representatives, after the 3d of May, 1927, to make an inventory of the goods in the store at Ferriday ; and they both admitted that no inventory of the goods in the store at Ferriday was ever furnished or tendered to Morgan & Lindsey or their representatives, and that no list of the creditors of the Ellis Variety Stores was ever furnished or tendered to Morgan & Lindsey or their representatives. The defendants’ contention in that- respect is that, when O. B. Ellis and the Morgan & Lindsey representatives parted hastily in Tallulah on the 3d of May, 1927, Ellis assumed that Morgan & Lindsey were merely. exercising their right to recede from their contract by forfeiting the $5,000 of earnest money.
 

 The defendants pleaded in their answer to the suit, and they contend in argument, that, according to the exact language of subsection (b) of section 2 of the Act of 1926, it was the duty of Morgan
 
 &
 
 Lindsey to demand a list of the creditors of the Ellis Variety Stores. The statute does say, “That the transferee shall demand of and receive from the transferor,” etc.; but that does not mean that the parties may not agree, in the promise of sale, that the transferor shall furnish the list of his creditors without any further demand on the part of the transferee. When
 
 *215
 
 the parties t'o a promise of sale do agree that the transferor shall furnish the list of his creditors at least ten days before the date fixed for making the transfer, the agreement, as far as the parties to it are concerned, dispenses with any further demand on the part of the transferee. That was the agreement of the parties in this ease.
 

 C. B. Ellis testified that he informed Morgan
 
 &
 
 Lindsey verbally, at the time of the signing of the contract, that the Ellis Variety Stores would have only two creditors on the date fixed for making the sale; and it appears that the Ellis Variety Stores did pay off all but two creditors between the Sth of April and the 3d of May, 1927. But those facts did not relieve the Ellis Variety Stores of their obligation to furnish Morgan
 
 &
 
 Lindsey the list or statement, sworn to, of the names and addresses of the creditors, within the time required by the act of 1926, to make a lawful sale of the stores on or before the 16th of May, 1926.
 

 Between the 8th and the ISth of April, 1927, the Ellis Variety Stores obtained from their four lessors, respectively, written permits to transfer to Morgan & Lindsey the leases on the buildings in which the Ellis Variety Stores conducted their business, or to sublease the' buildings to Morgan & Lindsey on the terms and conditions of the original leases; hut the Ellis Variety Stores did not offer to make the transfers or subleases to Morgan & Lindsey, or inform them that the authority had’ been obtained to make the transfers or subleases.
 

 On the 7th of May, 1927, Morgan
 
 &
 
 Lindsey wired from the'ir headquarters at Jasper, Tex., to the First National Bank, at Lake Providence, La., saying that the deal with the Ellis Variety Stores could not be consummated according to the contract, asking the bank to hold the earnest money, and saying that, if necessary, an injunction would be obtained as soon as possible. On the same day Morgan & Lindsey sent the bank a letter confirming the telegram, and saying that, on account of the flood, they had not been able to get to Ferriday to make an inventory of the goods in the store there. The bank referred the correspondence to the Ellis Variety Stores. On the 8th of May, 1927, Morgan & Lindsey wired C. B. Ellis, at Lake Providence, that they had tried to call him on the telephone, and asked him to release the earnest money at the bank, and to have the bank wire that the money was released, and to say where they could meet him as soon as possible. Morgan & Lindsey said in their telegram that it was the act of Ood that had prevented the carrying out of the contract. O. B. Ellis, in the name of his firm, answered by wire on the 9th <5f May, 1927, that the firm was then and had been at all times ready and anxious to carry out the contract, and demanded that Morgan & Lindsey carry out the contract. He said that the Ellis Variety Stores would not release Morgan & Lindsey from the contract, or release the earnest money, but would claim it under the provisions of the contract; that the contract had not been voided by an act of God; that the transfer could have been made on the date stipulated had it not been for Morgan
 
 &
 
 Lindsey’s default; that, as a compromise proposition, the Ellis Variety Stores would be willing to extend the time for completing the transfer of the stores for a reasonable time after the 16th of May, 1927, if Morgan & Lindsey would accept the proposition and
 
 *217
 
 so notify the Ellis Variety Stores before that date, and if they would agree to complete the transfer as soon as possible; that otherwise the Ellis Variety Stores would demand that the bank pay them the earnest money on May 17, 1927, as provided in the contract; that, under the law, Morgan & Lindsey had the right to recede from their promise to buy the stores, by forfeiting the earnest money; that the telegram was being confirmed by letter; and that Morgan & Lindsey could meet the members of the Ellis Variety Stores in Lake Providence on any date. On the 12th of May, 1927, the First National Bank of Lake Providence wired Morgan & Lindsey that the bank would deliver the original contract and the $5,000 earnest money to the Ellis Variety Stores on the 17th day of the month unless the hank received before that date a written order signed by both parties to the contract, directing that some other disposition be made of the fund, or received a court order restraining the bank from making thel delivery provided for in the contract. Morgan & Lindsey did not answer either Ellis’ or the bank’s telegram, hut served a written demand upon each of them for a return of the earnest money, on the 16th of May, 1927, and filed the suit that day, without asking for an injunction. The bank credited the $5,000 to the account of the Ellis Variety Stores on the 17th of May, 1927, without receiving or demanding from them any guaranty or security whatever.
 

 We agree with counsel for the Ellis Variety Stores that the obligations of the parties to the contract would not have been terminated by a fortuitous event, by the breaking of the levee on the 3d of May, 1927, if C. B. Ellis had demanded then of- the representatives of Morgan & Lindsey that the inventory of the stock in the store at Ferriday should be made in spite of the flood, and if in fact it could have been made in spite of the flood. The reason for that is that the parties to the contract knew, when they signed it, that there was great danger of a flood; hence Morgan & Lindsey assumed the risk that they would have to buy the stores on or before the 16th of May, 1927, or forfeit $5,000, if the other party to the contract should insist upon it, even though a disastrous flood might have greatly injured the business in the meantime. It has been decided that a flood caused by a crevasse in a levee on the bank of the Mississippi river is such a fortuitous event as may put an end to the obligations of a contract, if the breaking of the levee was not a matter of regular or frequent occurrence and was not deemed likely, or thought of, at the time of the making of the contract. Viterbo v. Friedlander, 120 U. S. 707, 7 S. Ct. 962, 30 L. Ed. 776. But it has been held also that a crevasse in a levee on the Mississippi-river is not an accident of “an extraordinary nature,” in the meaning of article 2743 of the Civil Code, if it was a matter of regular occurrence, or was known to be so apt to happen, at the time of the making of the contract, that the parties must have assumed the risk. Vinson v. Graves, 16 La. Ann. 162; Masson v. Murray, 21 La. Ann. 535; Jackson v. Michie, 33 La. Ann. 723; Payne v. James & Trager, 45 La. Ann. 384, 12 So. 492; Hollingsworth v. Atkins Bros., 46 La. Ann. 524, 15 So. 77.
 

 The giving of earnest money, as security for the carrying out of a promise to buy property, is like the posting of a forfeit, or liquidated damages, to be paid if the party
 
 *219
 
 promising to buy arbitrarily recedes from his promise; except that, in the giving of earnest money, each party to the contract is subject to the stipulated penalty if he arbitrarily recedes from the promise, or violates it. But the giving of earnest money to guarantee a promise to buy property does not subject the promisor to the penalty of forfeiture of the earnest money unless he violates his promise, or recedes from it arbitrarily, with the intention of forfeiting the earnest money, or without just cause for receding otherwise from his promise to buy.
 

 Our opinion is that the plaintiffs in this ease were not any inore in default than the defendants were, in the failure to carry out the contract. When C. B. Ellis and the representatives of Morgan & Lindsey parted at Tallulah, on the 3d of May, 1927, in the excitement caused by the breaking of the levee, Ellis had no more right or cause to assume that the representatives of Morgan & Lindsey were, by their departure, consenting to a forfeiture of the $5,000 earnest money, than they had to assume that Ellis was, by his departure, consenting to a like forfeiture on the part of his firm. Instead of assuming that the representatives of Morgan & Lindsey were intending to recede from their firm’s promise by forfeiting the earnest money, Ellis should have put Morgan & Lindsey or their representatives in default, by informing them that the Ellis Variety Stores intended to claim the earnest money, and by performing or offering to perform the obligations which the act of 1926 put upon his firm, and by thus letting Morgan & Lindsey know that, if the transfer was not made on or before the 16th of May, 1927, they would risk being condemned to forfeit the earnest money. That is what this court decided, virtually, when the court reversed the ruling of the district judge on the exception of no cause of action, and remanded the ease. In the opinion then .rendered, the author quoted approvingly from the appellants’ brief, an argument to the effect that the performance of all of the requirements of Act No. 270 of 1926 was a condition precedent to the obligation of the plaintiff to pay the price, and that, if the requirements of the act were not complied with by the Ellis Variety Stores, the obligation on the part of Morgan & Lindsey to pay the price never arose or came into existence.
 

 It is perhaps needless to add that Morgan & Lindsey were not under any obligation to accept the offer made by O. B. Ellis, for his firm, in the telegram dated the 9th of May, 1927, to extend the time in which the sale might be made, beyqnd the 16th of May, 1927. The only obligation on the part of Morgan & Lindsey, in that respect, was to buy the stores on or before the 16th of May, 1927, and then only if the requirements of Act No. 270 of 1926 were complied with at least ten days before the 16th of May, 1927. It will not do to say that the time limit was not an important stipulation of the contract. Any stipulation which the parties put into a contract concerning a commercial 'transaction is deemed to be an important stipulation, though the reason for it may not appear, and need not be explained. Held v. Goldsmith, 153 La. 598, 96 So. 272.
 

 The plaintiff prayed for a judgment against the commercial partnership styled Ellis Variety Stores and against the First National Bank of Lake Providence, La., in solido, but did not pray for a judgment against either of the individuals composing
 
 *221
 
 the partnership. The plaintiff therefore is' not entitled to have a judgment rendered against C. B. Ellis individually, or against John T. Ellis individually, in this suit; and, as we have said, there is no liability on the part of the bank.
 

 The judgment appealed from is affirmed in so far as it rejects the plaintiff's demand against the First National Bank of Lake Providence, La., and is annulled and reversed in so far as it rejects the plaintiff’s demand against Ellis Variety Stores; and it is now ordered, adjudged, and decreed that the plaintiff, firm of Morgan & Lindsey, of Jasper, Tex., recover of and from the commercial partnership styled Ellis Variety Stores, composed of C. B. Ellis and John T. Ellis, and domieiled in East Carroll parish, La., the sum of $5,000, with interest thereon at 5 per cent, per annum from the date of judicial demand, that is, from the 16th day of May, 1927, and the costs of this suit.