OPINION OF THE COURT
Carrol S. Walsh, J.
This is a proceeding to vacate or reduce a special assessment levied against the property of the petitioner for the cost of demolition of petitioner’s building by the respondent.
The assessment in this case is the aftermath of a series of *597 events precipitated by the collapse of two four-story buildings in the downtown central business district of the City of Gloversville. Petitioner was the owner of a commercial building in the district which was interconnected with several other buildings with common walls. One of the two buildings which had collapsed had a common wall with petitioner’s building and when the collapsed buildings fell on each other, the south wall of the petitioner’s building was left exposed, except for rubble resting against the first of its four stories.
Acting pursuant to the provisions of chapter 16 of the Gloversville City Code, the respondent’s city engineer, following hearings held by him, made a determination that petitioner’s building was dangerous and ordered that it be repaired or be demolished. When petitioner failed to make the required repairs or take any action to demolish its building, the building was demolished pursuant to a resolution adopted by the respondent directing the city engineer to cause demolition of petitioner’s building.
In a prior proceeding by the petitioner to review the city engineer’s determination, it was held that the petitioner had not demonstrated that there was any constitutional infirmity either in the procedures followed by the city engineer or in the applicable provisions of the city code and, further, that the city engineer’s determination was supported by substantial evidence (Matter of Seven South Main St. v Seaboyer, 57 AD2d 1031, mot for lv to app den 42 NY2d 809).
The present challenge of the petitioner focuses on the special assessment — the procedure by which the respondent seeks to recoup the funds expended by it in doing the job the petitioner ought to have done. Petitioner’s objection to the assessment is predicated upon the allegation that the special assessment is illegal, erroneous, and null and void, and should be vacated. Numerous reasons are urged by the petitioner in support of its contention, including some which have been resolved by the review of the city engineer’s determination in the appellate courts.
Initially, the claims that petitioner’s building was not dangerous and that the city engineer’s actions in making such a determination under chapter 16 of the Gloversville City Code were a nullity are not available to the petitioner in this proceeding in view of the confirmation of that determination in the prior proceeding.
In addition, the contention that the respondent acted ille *598 gaily in ordering demolition of petitioner’s building is untenable. "[T]he exercise of the police power in issue is not only statutorily authorized but is consonant as well with common-law principles and is constitutional”. (Lane v City of Mount Vernon, 38 NY2d 344, 349.)
The principal issue in this proceeding appears to revolve around the question of whether the respondent violated the competitive bidding requirements of applicable law in awarding the contract for demolition of petitioner’s building, without bidding, after a finding that an emergency existed. Section 3.20 of the Gloversville City Charter provides that "Any public work contract shall be awarded by the common council subject to the provisions of the [Gjeneral [Municipal [Law]”. Generally, under the statute referred to, awards are to be made "to the lowest responsible bidder furnishing the required security after advertisement for sealed bids”. (General Municipal Law, § 103, subd 1.) The statute contains an express exception that its provisions need not apply "in the case of a public emergency arising out of an accident or other unforeseen occurrence or condition whereby circumstances affecting * * * the life, health, safety or property of the inhabitants of a political subdivision * * * require immediate action which cannot await competitive bidding”. (General Municipal Law, § 103, subd 4.) There may be a question, though not raised here, as to whether the contract in this case is a "public work” contract since it involves demolition of a private building, the cost of which is ultimately assessed against the property. Does the fact that the municipality may recover the funds expended alter the character of the contract, and is this question affected by whether the municipality may recover such cost by action or must look to the property itself? The court is aware of the position of the State Comptroller that it is a "public work” contract (Opns St Comp No. 71-449, Feb. 24, 1972) and would be inclined to the same conclusion in view of the interests to be protected. However, that question need not concern us at this time and the court will, for the purposes of this proceeding, assume that the demolition contract in this case is a "public work” contract, subject to the requirements of the competitive bidding statute. In this regard, the petitioner contends that respondent was not faced with an emergency and was bound to advertise for sealed bids, and further, that its failure to do so rendered invalid the negotiated contract for demolition. The contract in question involved *599 the demolition of four interconnected buildings all of which were found to be dangerous, and of the total contract price of $59,000, the portion allocable to petitioner’s building was $7,666. In terms of the relief demanded by the petitioner, the question to be determined is whether, under the facts of this particular case, the respondent, not having submitted the proposed project to competitive bidding, can assess the cost of the demolition of petitioner’s building as a special assessment, and, if so, whether the amount of the special assessment against the petitioner’s property may be sustained.
The resolution of these questions must, of course, depend upon the meaning of the word "emergency” and the factual situation confronting the respondent at the time of its declaration that an emergency existed. Under the competitive bidding statute, the emergency must be one "arising out of an accident or other unforeseen occurrence or condition”. An emergency has been defined as " '[a]n unforeseen combination of circumstances which calls for immediate action’ ” (Lutzken v City of Rochester, 7 AD2d 498, 500), and as "an unforeseen combination of circumstances or the resulting state that calls for immediate action” (Webster’s New Collegiate Dictionary). "An occurrence or condition is unforeseen when it is not anticipated; when it creates a situation which cannot be remedied by the exercise of reasonable care (Ralph Perry, Inc. v. Metropolitan Cas. Ins. Co., 2 A D 2d 700, affd. 4 N Y 2d 983; Daiches v. United States Fid. & Guar. Co., 93 F. 2d 149; when it is fortuitous, Viterbo v Friedlander, 120 U. S. 707, 728).” (Rodin v Director of Purch. of Town of Hempstead, 38 Misc 2d 362, 365.)
In support of its position that no real emergency existed, petitioner submits a chronology of events encompassing a period of time between the collapse of the two buildings on September 6 and the date of respondent’s action in ordering demolition of petitioner’s building on November 26 in an effort to demonstrate that the respondent had ample opportunity to advertise for bids for the demolition of the buildings found to be dangerous. It attempts to buttress this argument by claiming that no significant change in the condition of its building occurred during that period of time. It also urges that the failure of the respondent to invoke the provisions of section 16-7 of the Gloversville City Code (chapter 16 — Buildings, Dangerous) is conclusive proof that no emergency existed and that the respondent and its officials never regarded the *600 situation as such. That section of the code permits the immediate repair, vacation or demolition of a dangerous building "where it reasonably appears that there is immediate danger to the life or safety of any person”.
Nothing in section 16-7 of the code compels the conclusion that the application of this section would terminate the rights of the property owner in the subject property, including the owner’s right to repair or demolish the dangerous building and an opportunity to do so, before the respondent was compelled to act. In fact, even under this section, opportunity would have to be afforded the property owner to correct the dangerous situation, it being his duty, and the municipality would have no right or primary obligation to take, summarily and arbitrarily, the private property of another by demolishing it without such notice and opportunity. While section 16-7 may be authority for the municipality to dispense with the hearing provided for in subdivision (B) of section 16-5 of the code and authority to take action more expeditiously upon the property owner’s failure or refusal to act in a situation covered by that section, it does not authorize arbitrary confiscation of property, which would be the result if petitioner’s interpretation were to be accepted. Respondent had no power to enter petitioner’s premises and demolish the building until certain procedural steps were taken and petitioner had either failed or refused to act after notice and demand.
Nor does the court find it unreasonable that the respondent held a hearing in this instance. It was aware that petitioner disputed the contention that its building was unsafe and dangerous. On the side of caution, lest it be subsequently determined that the city had acted illegally, and in the interest of fairness in view of petitioner’s position, respondent chose to hold a hearing at which evidence would be presented as to the condition of the building. Having elected to do so, respondent lacked the authority to undertake the work of demolition. Nor did it have the power to do so until after findings of fact were made, following the hearing, and the termination of the period of time given to the owner to undertake repair or demolition.
When it became evident that the owner did not intend to act, then, and only then, was respondent empowered to act. The threat of imminent collapse of petitioner’s building was a present one and there was sufficient evidence before respondent to support the probability of this occurring at any time. *601 An impending disaster was likely and any further delay improvident, imprudent and injudicious. Two four-story buildings on a main artery of a city had already collapsed. A third building which had abutted the southerly collapsed building was found to have shifted shortly after the initial collapse, and, during the course of its demolition by the owner, it too collapsed, with its rear wall falling outward and its side walls falling on each other. Petitioner’s building which had abutted the northerly collapsed building was found to have cracks and powdered bricks in its south wall. This wall was exposed and not supported in any way, except for rubble, and the reports of the engineers who had examined the building indicated that the wall could not withstand winds or the heavy vibration of traffic. To protect against this situation, northbound traffic was diverted to another street and southbound traffic was limited to five miles per hour. Petitioner apparently relies on the fact that the buildings were still standing in support of its argument that no emergency existed but this seems to suggest that no emergency could ever arise until the rumble of the building gave notice of its impending collapse. The court finds no merit in this argument. No one could predict whether collapse would occur in the next five minutes, or the next day, or within the next five months. Confronted with the situation and the evidence before it, the Common Council could not wait until the buildings collapsed before declaring an emergency and further delay was not only unwarranted but dangerous to the life, safety and property of the city’s inhabitants. The danger was present and existing and required immediate action which could not await competitive bidding. That the respondent had given the property owner the opportunity of a hearing to present evidence that the building was not dangerous and the further opportunity to repair and correct the danger after a finding that it was, before acting upon the owner’s failure to do so, does not alter the fact that an emergency existed. The mere passage of time will not undo an emergency situation if one existed before and is not the same as the case of inaction on the part of municipal officials in a foreseeable situation where the lapse of time itself created the emergency. (See Rodin v Director of Purch. of Town of Hempstead, 38 Misc 2d 362, supra; Matter of Building Contrs. of N. Y. v State of New York, 89 Misc 2d 279.) It is the reality of the situation rather than the choice of procedure employed by the city engineer which dictates determination of the issue.
*602 Clearly, at the time the respondent was empowered to act, confronted with the threat of imminent collapse, a true emergency existed within the meaning and intent of subdivision 4 of section 103 of the General Municipal Law, and the respondent’s action in proceeding without competitive bidding was lawful and justified. Whatever delay occurred prior to this time involved delay preceding the moment the respondent was authorized to undertake demolition. It may also be attributed to petitioner’s own resistance to the orders of the city’s officials and its failure or refusal to take steps to remedy an obvious dangerous situation.
The claim that the demolition contract was illegal because it included the demolition of other structures not held in common ownership with petitioner’s property is wholly without merit. All buildings demolished under the contract were interconnected and were found to be dangerous buildings after hearings held by the city engineer. The consolidation of all demolition in one contract was not only prudent, but desirable in the interest of economy, and in accord with customary practice.
Equally without merit is the contention that the demolition contract was not authorized by the resolution of the respondent which directed the city engineer to cause demolition of petitioner’s building because no direction was given in that resolution to demolish buildings other than petitioner’s. It was not necessary for the respondent to combine all directions to the city engineer in a single resolution and it is clear from the evidence that similar resolutions were adopted by the respondent as to the other buildings to be demolished.
Many other claims have been asserted by petitioner with respect to the legality and validity of the special assessment against its property. Some of these claims are not supported by any proof or evidence and merit no consideration, while others require only brief comment. It is claimed by petitioner that the special assessment is illegal and a nullity and should be expunged and vacated because the proposed allocation of the contract cost between the several buildings demolished was not in accordance with "frontage, area or other basis the Common Council could determine to be just and equitable”, but, instead, was the adoption of a determination made by a person other than an officer or employee of the city, and, thus, was not only arbitrary and capricious, but also an abuse of discretion. Chapter 16 of the city code (§ 16-6) requires that *603 the costs of demolition be charged against the land on which the building exists as a special assessment. Special assessments are governed by the provisions of article 18 of the Gloversville City Charter. The language quoted above is paraphrased from subdivision (c) of section 18.00 of the charter. It is applicable to public improvements made by the city at the expense of the owners of land benefited thereby. Its application here cannot aid the position of the petitioner. The Common Council made the allocation relying upon the recommendation of its city engineer. The city engineer’s recommendation was based upon his own experience in the field, the computations which he had made regarding the work performed, and the proposal of the contractor performing the work. There was testimony that the city engineer computed the cost of demolition of each building on a "square footage basis”. These computations were compared with the proposal of the contractor and, on the basis of the two, the city engineer determined that the proposal of the contractor represented a fair allocation of the demolition costs. Whether the city engineer and the contractor used the same method of computation was not made to appear. It would not have been unreasonable for them to use the same method, considering that all buildings were of the same height and of similar construction with some covering larger areas than others. Absent a showing of any differences between the buildings which would materially affect the relative cost of demolition of each unit, and none has been demonstrated here, it cannot be said that the allocation of the costs by the Common Council was arbitrary or capricious, or an abuse of discretion. The allocation by the Common Council was based upon the recommendation of its city engineer, expressed in terms of the contractor’s proposal, and was not based upon the recommendation of the contractor. The concurrence of their respective findings could not preclude the city engineer from making the recommendation he considered to be fair. Any other view would require the untenable conclusion that the proper basis for allocation can be determined only after two knowledgeable persons fail to agree on that question.
Neither was it necessary for the Common Council to make its allocation in terms of man and machine hours. The charter provision is not one of limitation; rather, it cloaks the Common Council with broad discretionary authority. So long as there is a reasonable and sound basis for the apportionment of *604 the cost and the determination of the Common Council upon such basis appears to be just and equitable as opposed to being purely arbitrary and capricious, such determination will not be disturbed by the court. Petitioner’s attack on the legality of the Common Council’s apportionment of the total cost of demolition is without merit and must fail.
Accordingly, the petition is dismissed.